In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3563

CHARLES STAINBACK,

*Plaintiff-Appellant*,

*v.*

RYAN DIXON, et al.,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Central District of Illinois.
No. 3:07-cv-03091-JES-BGC—**Jeanne E. Scott**, *Judge*.

ARGUED APRIL 15, 2009—DECIDED JUNE 30, 2009

Before FLAUM, RIPPLE and SYKES, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Charles Stainback brought this action pursuant to 42 U.S.C. § 1983 against Deputy Ryan Dixon, Deputy Douglas McFarland and Sheriff Donald Albrecht ("the Officers").[1] He alleged that he suffered shoulder injuries because the officers had used excessive

[1] Another officer, Sergeant Tom Throne, was included in the original complaint, but Mr. Stainback voluntarily dismissed his claims against Sergeant Throne.

force while arresting him. The district court granted summary judgment in favor of the Officers; it concluded that their conduct was reasonable under the circumstances. Mr. Stainback now challenges the district court's grant of summary judgment. He claims that the district court employed, to his prejudice, a flawed methodology when it addressed, as an initial matter, whether the Officers' conduct violated his constitutional rights. He also maintains that the district court erroneously concluded that the Officers' behavior was reasonable and therefore did not violate the Fourth Amendment. Upon examination of the record, we conclude, for the reasons set forth in this opinion, that the district court employed an acceptable methodology, that its approach worked no unfairness to Mr. Stainback and that the Officers did not employ excessive force in violation of his Fourth Amendment rights. We therefore affirm the judgment of the district court.

# I

## BACKGROUND

### A. Facts

Mr. Stainback was visiting his sister at the senior citizens' building in Royal Lakes, Illinois, when an intoxicated resident of that facility became angry with him and threatened to call the police. A resident at the senior citizens' building did call the police to report the disturbance, and the Officers, along with Sergeant Tom Throne, responded to the call. When the Officers

arrived at the senior citizens' building, they were told that Mr. Stainback had been involved in the disturbance but had left the area prior to the Officers' arrival.

The Officers suspected that Mr. Stainback was at Al Bauza's[2] residence. They went to Bauza's house, knocked on the door and asked for Mr. Stainback. Mr. Stainback voluntarily left the house. Deputy Dixon asked him to turn around and face the wall; Mr. Stainback complied with the request. Deputy Dixon then informed Mr. Stainback that he was being placed under arrest because of an outstanding traffic warrant and asked Mr. Stainback to put his hands behind his back. Mr. Stainback did not do so. Instead, he asked the Officers not to handcuff him because he believed he would be hurt if he were handcuffed.[3] He did not, however, inform the Officers of any preexisting injuries to his arms or shoulders. Deputies Dixon and McFarland grabbed Mr. Stainback's arms, quickly pulled his arms behind his back, handcuffed him and performed a pat-down search.

After handcuffing Mr. Stainback, the deputies walked him down the driveway toward Deputy McFarland's squad car. As they did so, they told Mr. Stainback that he could be released upon paying a $200 bond. Mr.

---

[2] At one point in the record, this name is spelled "Bowza." We shall assume, however, that the predominant spelling is correct.

[3] It is not clear from the record whether Mr. Stainback conveyed this belief to the Officers.

Stainback told the Officers that his daughter, who was at his house, could post his bond. The Officers decided to take Mr. Stainback to his home so that his daughter could pay his bond, and they placed him in the back of the squad car. After Mr. Stainback was seated, he complained that the handcuffs were hurting his shoulders and asked the Officers to remove them. The Officers told Mr. Stainback that they would remove the handcuffs in a few minutes. Deputy McFarland then drove Mr. Stainback to his home.[4] During the two- to three-minute drive, Mr. Stainback again asked Deputy McFarland to remove his handcuffs because they were hurting his shoulders, but Deputy McFarland did not do so.

When the Officers arrived at Mr. Stainback's residence, Deputy Dixon rang the doorbell and explained the situation to Mr. Stainback's daughter. She posted Mr. Stainback's bond. The Officers then removed Mr. Stainback's handcuffs. Mr. Stainback estimates that he was in handcuffs for fifteen to twenty minutes. He alleges that, as a result of the Officers' conduct, he suffered two torn rotator cuffs, which required surgery and medical treatment.

---

[4] The Officers drove to Mr. Stainback's residence in separate vehicles.

## B. Proceedings in the District Court

Mr. Stainback filed a complaint in the United States District Court for the Central District of Illinois; he alleged that the Officers had used excessive force against him in violation of his constitutional rights. In their answer to Mr. Stainback's complaint, the Officers asserted that they were entitled to qualified immunity. The Officers later filed separate motions for summary judgment: Deputies Dixon and McFarland argued that summary judgment was proper because they were entitled to qualified immunity; Sheriff Albrecht maintained that he was entitled to summary judgment because he had not been involved personally in the arrest.

The district court granted the Officers' motions. It noted that the Officers had a valid warrant to arrest Mr. Stainback. It also recognized that, when the Officers instructed Mr. Stainback to place his hands behind his back, he had failed to do so. In light of these circumstances, the court determined, it was reasonable for the Officers to quickly move Mr. Stainback's arms behind his back, to handcuff him and to leave him in handcuffs for fifteen to twenty minutes until they secured his bond. The court reasoned that, because the amount of force used by the Officers had been reasonable under the circumstances, summary judgment in favor of the Officers was appropriate.

## II

## DISCUSSION

"Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Antonetti v. Abbott Labs.*, 563 F.3d 587, 591 (7th Cir. 2009) (citing Fed. R. Civ. P. 56(c)). We review the district court's grant of summary judgment de novo, construing all facts and reasonable inferences in favor of the non-moving party. *Marion v. City of Corydon, Ind.*, 559 F.3d 700, 704 (7th Cir. 2009).

We first consider whether the district court applied an acceptable methodology and then turn to the question of whether the officers employed excessive force.

## A.

To determine whether a defendant is entitled to qualified immunity, courts must address two issues: (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation. *Phelan v. Vill. of Lyons*, 531 F.3d 484, 487 (7th Cir. 2008). Mr. Stainback claims that none of the Officers addressed the first prong of this test—whether the Officers' use of force was excessive—in their motions for summary judgment. Rather, Deputies Dixon and McFarland argued only that they had not violated clearly established law; Sheriff Albrecht claimed only that he could not be liable

for Mr. Stainback's injuries because he did not physically touch Mr. Stainback and therefore did not participate directly in the allegedly unconstitutional conduct. Mr. Stainback maintains that, because none of the defendants addressed the first prong of the qualified immunity test, the district court erred by addressing the issue.

At the time the district court entered summary judgment, *Saucier v. Katz*, 533 U.S. 194, 201 (2001) required that courts begin their analysis by addressing the first prong of the qualified immunity test and determining whether the facts, taken in the light most favorable to the plaintiff, demonstrated that the defendant's conduct violated the plaintiff's constitutional rights. *Id.*; *Phelan*, 531 F.3d at 487. Only if a constitutional violation was established could a court address the second inquiry: whether the plaintiff's right was clearly established at the time of the violation. *Saucier*, 533 U.S. at 201; *Phelan*, 531 F.3d at 487. The Supreme Court now has concluded, however, that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009). Courts are now "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id.* In this case, the district court understandably followed the methodology mandated by *Saucier* and first addressed whether the Officers' actions violated Mr. Stainback's constitutional rights. Because it found that no violation

had occurred, it was unnecessary for it to address the reasonableness of the Officers' actions under the second prong of the established inquiry.

Mr. Stainback maintains that the district court treated him unfairly by addressing initially the first prong of the qualified immunity test. In his view, he did not have a fair opportunity to address the first prong of the test because the Officers' motions addressed only the second prong and, consequently, he answered only the second prong. We cannot accept this contention. Upon examination of the record, we must conclude that the Officers' motions for summary judgment and supporting memoranda raised adequately both prongs of the qualified immunity test. In their memorandum in support of their motion, Deputies Dixon and McFarland argued explicitly that "the manner and method of handcuffing [Mr. Stainback] . . . was not an excessive use of force," R.32 at 8-9, and relied upon federal case law in support of that contention. Thus, Deputies Dixon and McFarland specifically raised the issue of whether they had used excessive force in their motion for summary judgment. Sheriff Albrecht did not raise specifically the qualified immunity issue. Instead, his supporting memorandum focused primarily on his argument that he did not participate in Mr. Stainback's arrest. Notably, however, in his response to Sheriff Albrecht's motion, Mr. Stainback claimed that Sheriff Albrecht was liable for failing to intervene to prevent the Deputies from violating his constitutional rights. R.34 at 5-7. Sheriff Albrecht then responded to the merits of that argument and argued that it was im-

proper for Mr. Stainback to raise a failure-to-intervene claim at that point in the litigation. R.38 at 1-4. The success of Mr. Stainback's failure-to-intervene claim, therefore, was entirely dependent upon the issue of whether a constitutional violation had occurred as a result of the Deputies' conduct—the issue squarely raised by the submission of Deputies Dixon and McFarland. *Cf. Leaf v. Shelnutt*, 400 F.3d 1070, 1093 (7th Cir. 2005) ("Because we have determined that the officers' actions inside the apartment constituted neither an illegal search nor an illegal seizure, we must conclude that the Leafs do not have a cognizable claim against Deputy Shelnutt for failing to intervene in Deputy Jacobs' actions.").

The parties' submissions to the district court demonstrate that both prongs of the qualified immunity test were properly before the district court. Mr. Stainback had adequate notice that the court might reach both prongs of the qualified immunity test in the course of deciding the summary judgment motion. Moreover, as we noted earlier, *Saucier*, the controlling precedent at the time of the motions for summary judgment, required the district court to evaluate first whether the Officers' conduct violated Mr. Stainback's constitutional rights before it considered whether his rights were clearly established at the time of the violation. *Saucier*, 533 U.S. at 201; *Phelan*, 531 F.3d at 487. Mr. Stainback therefore should have expected that the district court would address first whether the Officers' conduct constituted a constitutional violation.

**B.**

The Fourth Amendment's reasonableness standard governs our evaluation of a plaintiff's claim that law-enforcement officers employed excessive force during an arrest, an investigatory stop or any other type of seizure. *Graham v. Connor*, 490 U.S. 386, 395 (1989). Assessing whether the force used to effectuate a particular seizure is reasonable "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (citations and quotation marks omitted). Consequently, the use of significant or even deadly force may be justified when the Government has a significantly grave interest in employing such force.[5] The nature and extent of the force that may be used depends upon the circumstances surrounding the arrest, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by

---

[5]  *Compare Marion v. City of Corydon, Ind.*, 559 F.3d 700, 706 (7th Cir. 2009) (holding that it was reasonable for officers to discharge their firearms in the plaintiff's direction when they reasonably could have believed that the plaintiff presented a serious danger to the officers and innocent bystanders), *with Abdullahi v. City of Madison*, 423 F.3d 763, 769-71 (7th Cir. 2005) (rejecting a qualified immunity claim where an officer may have used deadly force against an individual lying prone on the ground with his arms behind him).

flight." *Id.* at 396. We must view these factors as they would have appeared to a reasonable officer at the scene. In assessing the facts from that perspective, we must recognize that officers often need to make split-second judgments based on rapidly developing events. *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 685 (7th Cir. 2007).

An officer who has the right to arrest an individual also has the right to use some degree of physical force or threat of force to effectuate the arrest, *Graham*, 490 U.S. at 396, but that right is circumscribed by the Fourth Amendment's insistence on reasonableness. In this respect, our cases indicate that an officer may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury. *See Herzog v. Vill. of Winnetka, Ill.*, 309 F.3d 1041, 1043 (7th Cir. 2002). Of course, whether an officer knows that a given action unnecessarily will harm a particular individual will depend upon the circumstances of the arrest. In some cases, the fact that an act will cause pain or injury will be clear from the nature of the act itself. *See, e.g., Payne v. Pauley*, 337 F.3d 767, 779 (7th Cir. 2003) (concluding that it was not objectively reasonable for the officer to twist the plaintiff's arm, force her arms behind her back and over-tighten her handcuffs to the point of causing numbness and significant injury when the plaintiff had not threatened harm to anyone, was not resisting arrest and was charged with a minor offense). In other cases, it may become clear to an arresting officer that, although a particular action

would not ordinarily harm an arrestee, the action would nevertheless cause pain or injury to the particular individual being placed under arrest. For example, an officer's otherwise reasonable conduct may be objectively unreasonable when the officer knows of an arrestee's medical problems.[6]

However, a reasonable officer cannot be expected to accommodate an injury that is not apparent or that otherwise has not been made known to him. *See Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006) (concluding that the arresting officer did not act unreasonably when he fastened the plaintiff's handcuffs too tightly, and the plaintiff, whose injuries did not require medical care, complained only once about his handcuffs "without elaborating on any injury, numbness, or degree of pain"); *Estate of Phillips v. City of Milwaukee*, 123 F.3d 586, 594 (7th Cir. 1997) (holding that it was not unreasonable for the officers to place the arrestee in a prone position, even though doing so resulted in his death, when the

---

[6] *See Frazell v. Flanigan*, 102 F.3d 877, 885 (7th Cir. 1996) (noting, in the alternative, that a reasonable jury could have found that the officer knew of the plaintiff's medical condition and "could then have concluded that [the officer's] conduct in the face of that knowledge was unreasonable"), *overruled on other grounds by McNair v. Coffey*, 279 F.3d 463 (7th Cir. 2002); *Walton v. City of Southfield*, 995 F.2d 1331, 1342 (6th Cir. 1993) ("An excessive use of force claim could be premised on [the officer's] handcuffing [the plaintiff] if he knew that she had an injured arm and if he believed that she posed no threat to him."), *superseded by court rule on other grounds*.

officers were unaware of the arrestee's medical problems).[7]

We must conclude that the record establishes that the Officers' actions were reasonable under the circumstances surrounding Mr. Stainback's arrest. The Officers did not use handcuffs in a manner that would clearly injure or harm a typical arrestee. Furthermore, it was not

---

[7] Unlike the plaintiff in *Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006), Mr. Stainback did suffer an injury that required medical treatment, and, he submits, an injury of such seriousness constitutes evidence from which a jury could find that unnecessary force was used. Our cases make clear, however, that, to survive summary judgment, a plaintiff must do more than point to his injury or its seriousness; he must also "identify the *specific unreasonable conduct* that caused his or her injuries." *Abdullahi*, 423 F.3d at 770-71 (emphasis supplied). In *Abdullahi*, the fact that the arrestee ultimately died from his injuries, *together with* the evidence that the defendant had knelt on his back, presented a jury question as to whether the officer reasonably applied slight pressure with his knee to prevent the arrestee from squirming, as the officer claimed, or whether he unreasonably pushed down onto the plaintiff's back with his full weight, as the plaintiff claimed. *Id.* at 771-73. The plaintiff's interpretation described *unreasonable* conduct which caused the injury in question. Here, Mr. Stainback claims only that the Officers "quickly" put his arms behind his back and handcuffed him. As we shall explain, Mr. Stainback's version of the events does not describe conduct that was objectively unreasonable. Therefore, evidence of the seriousness of Mr. Stainback's injury alone, without evidence of an objectively unreasonable act, cannot create a genuine issue of fact as to whether the Officers' actions were reasonable.

objectively clear to the Officers that Mr. Stainback suffered from any infirmities, *see Estate of Phillips*, 123 F.3d at 594, nor did Mr. Stainback inform the Officers that he had a preexisting injury or condition that would be aggravated if he were handcuffed, *see Frazell v. Flanigan*, 102 F.3d 877, 885 (7th Cir. 1996). Had the Officers known of a preexisting injury or medical condition that would have been aggravated by handcuffing Mr. Stainback, or had Mr. Stainback communicated to the Officers that he suffered from such an infirmity, the Officers certainly would have been obligated to consider that information, together with the other relevant circumstances, in determining whether it was appropriate to handcuff Mr. Stainback. The record does not support the conclusion that the Officers knew or were informed of any such infirmities. At most, the record shows that Mr. Stainback said that he did not want to be handcuffed because he thought it would hurt and that Mr. Stainback complained generally about pain after he was handcuffed. These generalized complaints, without any elaboration regarding a preexisting injury or other infirmity, would not have placed a reasonable officer on notice that Mr. Stainback would be injured by these actions. We therefore must conclude that the Officers' actions were reasonable under the circumstances and that no violation of the Fourth Amendment occurred.

**Conclusion**

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED