In the

# United States Court of Appeals
## For the Seventh Circuit

No. 11-3904

SCOTT RABIN,

*Plaintiff-Appellee,*

*v.*

MICHAEL FLYNN, TODD KNEPPER,
JOHN QUINLAN, *et al.*,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:09-cv-08049—**Elaine Bucklo**, *Judge.*

ARGUED APRIL 2, 2013—DECIDED JULY 9, 2013

Before ROVNER, WILLIAMS, and SYKES, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* After the police noticed Plaintiff Scott Rabin carrying a holstered gun on his hip in public, he was handcuffed and detained for about one-and-a-half hours while the officers sought to confirm the validity of his carrying license. None of the three detaining officers were familiar with the unique license Rabin had on hand, one carried primarily by private detectives and security officers. When it was finally

confirmed that Rabin's license was legitimate, he was released. Rabin then sued the individual officers for unlawful arrest and excessive force, arguing that the officers should have known what that license was and should have released him as soon as he presented it. The district court denied the officers' motion for summary judgment to the extent that it sought qualified immunity for both claims.

We find that the officers are entitled to qualified immunity on the unlawful arrest claim, because even if the officers had known what that type of license was, it still would have been reasonable under clearly established law for them to detain Rabin while they verified the legitimacy of a license to carry a deadly weapon. Though the length of Rabin's detention was unfortunate, it was largely caused by the government's failure to have an efficient system of license verification. As for Rabin's excessive force claims, which allege that the unnecessary tightness of the handcuffs exacerbated his pre-existing medical conditions, the evidence shows that Rabin only told Deputy Sheriff Todd Knepper about his medical issues. So while Knepper is not entitled to qualified immunity on that claim, the other two officers are. Therefore we affirm the district court's denial of qualified immunity for Knepper on the excessive force claim, but reverse the district court's denial of qualified immunity for the rest of the claims.

## I. BACKGROUND

Because the officers moved for summary judgment, we construe the facts in favor of the plaintiff. On Decem-

ber 19, 2009, Plaintiff Scott Rabin, working as a licensed private investigator, was serving a court order on a registered corporate agent at an office complex in Buffalo Grove, Illinois. Deputy Michael Flynn, who was also serving process in that area, saw that Rabin was wearing a holstered gun on his hip. Flynn stopped Rabin and asked if he had a gun. Rabin said yes, explained that he was a licensed private investigator, and presented a carrying license called a "tan card" (formally called a "firearm control card").[1] It is undisputed that Rabin's tan card legally authorized Rabin to carry a gun at the time he was stopped by Flynn. *See* 225 ILCS 447/35-35.

Flynn, however, did not know what a tan card was. So he confiscated Rabin's gun, which was fully loaded, and made a radio call to his dispatcher asking him to run the tan card through a system called LEADS ("Law Enforcement Agencies Data System"). The dispatcher said he could not verify the card through LEADS, that the tan card "might be a concealed carry card," and that he would call the "Springfield desk." After a few minutes, Flynn called the dispatcher again to see if Springfield

---

[1] The firearm control card is called a "tan card" because of the unique tan color of the card. *See Haywood v. City of Chicago*, 378 F.3d 714, 715 (7th Cir. 2004) (a " 'tan card' . . . certifies that the cardholder, being employed by a licensed security agency . . . and having received firearms training, may carry a weapon while working or commuting"). Rabin also presented Flynn a Private Detective License and a Firearm Owner's Identification Card, but these cards did not independently authorize Rabin to carry a firearm and are not directly relevant to our analysis.

knew anything about the tan card, and was told that it did not.

Deputy Sheriff Todd Knepper, who had heard on the radio that Flynn was with a man with a gun, arrived on the scene, confirmed that Rabin was the person who was armed, then handcuffed and searched him. Rabin repeated to Flynn and Knepper that he was authorized to carry the gun, but Knepper also did not know what a tan card was and put Rabin into the back of Knepper's vehicle.

Deputy Sheriff John Quinlan then arrived in a "cage" car. Flynn updated him on the situation, but Quinlan also did not know what a tan card was. Knepper brought Rabin out of his vehicle and put him in Quinlan's cage car for transport to the police station. Rabin then told the three officers that his handcuffs were "tight." Quinlan removed the handcuffs and placed his own handcuffs on Rabin (the parties agree that switching handcuffs in this manner is normal when someone is being transported to the station). Rabin then asked Knepper if the handcuffs could be left off, told him that he had a "bad neck" and a "bad hand in the past," and that the second pair was even tighter than the first pair. Knepper did not do anything about the handcuffs, and Rabin was left in the cage car for about 25 minutes. During this time, Rabin tried to get the officers' attention from within the closed car and yelled a couple times, "Can you please come here?", but no one responded. Quinlan then removed the handcuffs and put Rabin in a non-cage squad car. Rabin was taken to the Buffalo Grove Police Department, a 30-minute drive.

Eventually, the Lake County State's Attorney's Office confirmed that Rabin could lawfully carry the gun. (There is nothing in the record that explains how exactly Rabin's tan card was verified, or how the State's Attorney's Office came to be involved in the verification process.) Rabin was then released. (Rabin's brief asserts that the tan card was verified *before* his 30-minute trip to the police station, but none of the brief's citations supports such a fact or inference.) Construing the facts in the light most favorable to Rabin, he was detained for a total of about an hour-and-a-half, and it is undisputed that Rabin acted in a cooperative manner during the entire incident. Afterwards, Rabin allegedly suffered swelling and bruising to his wrists, muscle spasms in his neck, and needed to see a hand surgeon. He also had surgery on his neck to deal with the pains related to these injuries.

Rabin sued Flynn, Knepper, Quinlan, and other defendants including Cook County pursuant to 42 U.S.C. § 1983, for unlawful arrest and excessive force in violation of the Fourth Amendment. The defendants filed a motion for summary judgment, which the district court denied in relevant part, finding that Flynn, Knepper, and Quinlan were not entitled to qualified immunity. This appeal concerns solely the district court's denial of qualified immunity for the three individual officers.

## II. ANALYSIS

"The doctrine of qualified immunity protects government officials from liability for civil damages when their conduct does not violate clearly established statutory

or constitutional rights of which a reasonable person would have known." *Humphries v. Milwaukee Cnty.*, 702 F.3d 1003, 1006 (7th Cir. 2012) (citations and quotation marks omitted). To be clearly established at the time of the challenged conduct, the right's contours must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right," and "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citations and internal quotation marks omitted). This standard "protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably . . . anticipate when their conduct may give rise to liability for damages." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and citation omitted). "[A] court may grant qualified immunity on the ground that a purported right was not 'clearly established' by prior case law without first resolving whether the purported right exists." *Humphries*, 702 F.3d at 1006 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). The plaintiff carries the burden of defeating the qualified immunity defense, and we review the district court's grant of summary judgment on the basis of qualified immunity de novo. *Id.* Where, as here, the denial of qualified immunity was based on an issue of law, we have jurisdiction to consider appeals from such denials. *Hernandez v. Cook Cnty. Sheriff's Office*, 634 F.3d 906, 912 (7th Cir. 2011).

### A. The Officers Are Entitled to Qualified Immunity On Rabin's Wrongful Arrest Claim

Generally speaking, the Fourth Amendment permits officers to perform an investigatory stop if they have a reasonable and articulable suspicion of wrongdoing. *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008). In evaluating the reasonableness of an investigatory stop, we examine whether the " 'officer's action was justified at its inception' " and " 'whether it was reasonably related in scope to the circumstances which justified the interference in the first place.' " *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). When an officer's use of force during such a *Terry* stop becomes so disproportionate to the purpose of such a stop in light of the surrounding circumstances—and the purpose may include ensuring the safety of the officers or others—then the encounter becomes a formal arrest (which must then be justified by probable cause). *Id.* at 824-25; *United States v. Adamson*, 441 F.3d 513, 520 (7th Cir. 2006). "There is no bright-line rule as to how long an investigative detention may last; instead we look to whether the police diligently pursued a means of investigating that was likely to confirm or dispel quickly their suspicions." *Id.* at 521.[2]

---

[2] The parties frame the dispute as being about whether the officers' initial investigatory stop ever became a formal arrest, but the core of the dispute is really over whether Rabin's presentation of his tan card should have been enough to assure the officers that Rabin was acting lawfully. If it was,

(continued...)

Rabin acknowledges that Flynn's initial investigatory stop of Rabin was "justified at its inception" because Rabin was visibly carrying a weapon, but argues that his detention became unlawful as soon as he presented his tan card, because any initial suspicion of wrongdoing or danger should have been immediately dispelled. He argues that the officers should have known that the relevant statute clearly authorizes tan card holders to carry concealed firearms in public. The defendants respond that officers cannot be expected to know every single provision of the law, including obscure exemptions to the unlawful public carrying statute that covers private detectives, nor should they be expected to anticipate affirmative defenses (they assert that the tan card is like an affirmative defense) that might excuse suspected misbehavior.

We agree with Rabin that a police officer's suspicion of wrongdoing that is premised on a mistake of law cannot justify a *Terry* stop. We held in *United States v. McDonald*, 453 F.3d 958 (7th Cir. 2006) that a "police officer's mistake of law cannot support probable cause to conduct a stop," *id.* at 961, however understandable that mistake of law might be, and we later applied that rule to

---

(...continued)

then the officers lacked both reasonable suspicion *and* probable cause to continue detaining Rabin, whether or not Rabin's detention is considered a *Terry* stop or a formal arrest. If not, then reasonable suspicion along with safety considerations may have been enough to justify a *Terry* detention while the license was being verified.

the *Terry* stop context. *See, e.g.*, *United States v. Tyler*, 512 F.3d 405, 411 (7th Cir. 2008). This principle, however, does not help Rabin because it only makes sense in situations where a reasonable officer would know all the facts that he or she needs to determine whether the suspected activity is unlawful. For instance, in *Pritchard v. Hamilton Township Bd. of Trustees*, 424 Fed. Appx. 492, 506 (6th Cir. May 25, 2011), a case relied upon by both Rabin and the district court, the officers arrested an underage individual for consuming alcohol, but knew full well that he was drinking alcohol with his father. The Sixth Circuit found that the officers' ignorance of the law—that Ohio law allowed underage drinking under the supervision of a parent—was no excuse for their arrest given the facts that they knew. *See id.* at 504-05. If, however, a reasonable officer would not have known that the supervising adult was actually his parent, it may not have been unreasonable to temporarily detain the teenager while reasonable steps were taken to promptly verify the adult's parental status.

In this case, even if the officers should have known what a tan card was, the officers still did not know (or have reason to know) all the relevant *facts* to determine whether Rabin could lawfully carry a gun in public[3]— specifically, whether Rabin's tan card was legitimate. Under these circumstances, it would not be clearly unreasonable for an officer to believe that releasing an indi-

---

[3] The relevant events took place before *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012) was decided.

vidual that may be unauthorized to carry a deadly weapon would present an unacceptable risk of danger to themselves or the public. *See Jewett*, 521 F.3d at 824 ("In evaluating whether the force that an officer used to effectuate the investigatory stop was so disproportionate to the purpose of such a stop as to convert the encounter into a full arrest, we consider whether 'the surrounding circumstances g[a]ve rise to a justifiable fear of personal safety' on the part of the officer . . . ." (citation omitted)); *United States v. Stewart*, 388 F.3d 1079, 1084-85 (7th Cir. 2004) (investigatory stop can be justified where the suspect is "potentially dangerous"); *see also Schubert v. City of Springfield*, 589 F.3d 496, 503 (1st Cir. 2009) ("Just as an officer is justified in attempting to confirm the validity of a driver's license, such a routine check is also valid and prudent regarding a gun license."). And though we are troubled by the use of handcuffs in the context of a *Terry* stop even after Rabin's gun (the primary source of danger) had been confiscated, an officer could have reasonably believed under clearly established law at that time that handcuffs may be used during a *Terry* stop when dangerous weapons are generally involved. *See, e.g.*, *Stewart*, 388 F.3d at 1085. *But see Ramos v. City of Chicago*, ___ F.3d ___, 2013 WL 2264346, at *4 (7th Cir. May 24, 2013) ("The proliferation of cases in this court in which '*Terry*' stops involve handcuffs and ever-increasing wait times in police vehicles is disturbing, and we would caution law enforcement officers that the acceptability of handcuffs in some cases does not signal that the restraint is not a significant consideration in determining the nature of

the stop."). Though Rabin's brief suggests that the officers should have simply let him go as soon as he presented his tan card, he fails to point to any case clearly establishing that officers are required to take such documents at face value, especially when the authorization to carry a fully loaded handgun is at stake. In other words, Rabin does not show that the individual officers failed to "diligently pursue[] a means of investigating that was likely to confirm or dispel quickly their suspicions" that Rabin was not authorized to carry a gun. *Adamson*, 441 F.3d at 521.

At oral argument, Rabin's counsel acknowledged that officers may reasonably attempt to verify the legitimacy of a gun license before releasing a license-holder. But Rabin asserts that the officers could have instantly verified the tan card. He says that there is a "publicly accessible database through which the [tan] card can be verified within seconds" whose web address "appears on the face of the [tan] card itself," and that "Plaintiff even told the officers to look at the card for the verifying information, but they refused to do so." However, neither of these factual assertions (made at oral argument and in his brief) are supported by any citations to the record. Perhaps for good reason, because the photocopy of the front and back of Rabin's tan card found in the record *did not* have any web address on it at all. *See* Dist. Ct. Dkt. Nos. 67-3 at 69-70; 64-1 at 17.[4] To the extent

---

[4] According to that part of the record, Rabin's Private Investigator License did include a website, but nothing on that card

(continued...)

some other part of the record indicates otherwise, it is counsel's responsibility to point it out. *See Gross v. Town of Cicero*, 619 F.3d 697, 702 (7th Cir. 2010) ("As we have repeated time and again, 'Judges are not like pigs, hunting for truffles buried in [the record].'" (citation omitted)). And because the web address was not on Rabin's tan card, his assertion that he told the officers to "look at the card" for the verifying information is irrelevant even if it were true.

We do not intend to suggest that taking one-and-a-half hours to simply verify a gun license is reasonable under these circumstances. *Cf. Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."); *Arizona v. United States*, 132 S. Ct. 2492, 2509-10 (2012) (discussing whether state law requiring verification of immigration status before release would result in unconstitutional prolonged detention). But there is no evidence that *the individual officers* (or their ignorance of the law) were responsible for the prolonged verification process. When Flynn was presented with the tan card, he did not sit there scratching his head, but promptly turned to other channels in an attempt to verify it. Perhaps the police department or other relevant government agency

(...continued)
suggested that the tan card could be verified at the website indicated in the brief.

should have had a system in place that could more efficiently verify tan cards. But Rabin does not point to any cases clearly establishing that *individual officers* are personally responsible for curing such systemic failures, which is hard to imagine given that such failures are likely outside their control. *Cf. Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 304 (7th Cir. 2009) ("If, for instance, the officer had pled an affirmative defense such as good faith, then the jury might have found that the plaintiff's constitutional rights were indeed violated, but that the officer could not be held liable. In that case, one can still argue that the City's policies caused the harm, even if the officer was not individually culpable."); *Woodward v. Correctional Med. Servs. of Ill., Inc.*, 368 F.3d 917, 929 (7th Cir. 2004) (employee's "lack of training and carelessness" relevant to establishing liability of employer, even if employee was not found liable). Rabin correctly notes that under the roughly analogous circumstances of *Schubert*, decided after the events here, the officer let the plaintiff go after a few minutes as soon as he realized that verifying the gun license "could take a significant amount of time," *Schubert*, 589 F.3d at 500, since "Massachusetts did not have a simple way for police officers to conduct such a check." *Id.* at 503. But even if this decision had been issued as of the time of Rabin's detention, it does not clearly say that an officer's *failure* to let someone go after a few minutes under similar circumstances is a constitutional violation. *See also Estate of Escobedo v. Bender*, 600 F.3d 770, 781 (7th Cir. 2010) (discussing limited role of non-controlling precedent in qualified immunity analysis).

In sum, given the safety risks at stake, it was reasonable under clearly established law for the officers to temporarily detain Rabin pending the verification of his gun carrying license, even if the officers had known about the tan card exemption under the law. His prolonged detention was then caused by systemic failures outside the individual officers' control. So the officers are entitled to qualified immunity on Rabin's wrongful arrest claim.

## B.  Officers Flynn and Quinlan Are Entitled to Qualified Immunity On Rabin's Excessive Force Claim

Rabin also asserts an excessive force claim against the officers, alleging that his handcuffs were overly tight and exacerbated his preexisting medical conditions. When an officer stops or arrests an individual, some degree of physical force may be used, but the Fourth Amendment requires that the degree of force used be reasonable. *Stainback v. Dixon*, 569 F.3d 767, 772 (7th Cir. 2009). "In this respect, our cases indicate that an officer may not knowingly use handcuffs in a way that will inflict unnecessary pain or injury on an individual who presents little or no risk of flight or threat of injury." *Id.* In *Stainback*, which was decided prior to Rabin's detention, we found that the arresting officers did not use excessive force in that case, but we explained, "[h]ad the Officers known of a preexisting injury or medical condition that would have been aggravated by handcuffing Mr. Stainback, or had Mr. Stainback communicated to the Officers that he suffered from such

an infirmity, the Officers certainly would have been obligated to consider that information, together with the other relevant circumstances, in determining whether it was appropriate to handcuff Mr. Stainback." *Id.* at 773.

Here, Rabin proffers evidence that he directly told Officer Knepper about his "bad neck" and "bad hand in the past" and that the handcuffs were overly tight,[5] and it was undisputed that Rabin was cooperative the entire time. Given that Rabin was already handcuffed, no reasonable officer who was aware of Rabin's medical conditions would have believed that exacerbating Rabin's medical problems (i.e., by keeping the handcuffs as tight as they were) was necessary to ensure safety, and that doing so would be permissible under clearly established law. Therefore, Knepper is not entitled to qualified immunity at this summary judgment stage, and he will have an opportunity at trial to dispute Rabin's story or explain why he did not loosen the handcuffs. Officers Flynn and Quinlan, however, are entitled to qualified immunity because there is no evidence that Rabin specifically made them aware of his medical history, and his other generalized complaints of pain are insufficient to show excessive force. *See Stainback*, 569 F.3d at 773 ("These generalized complaints, without any elaboration regarding a preexisting injury or other infirmity, would not have placed a reasonable officer on notice that Mr. Stainback would be injured by these actions.").

---

[5] Rabin's brief asserts that he told Quinlan about the bad neck and bad hand injury, but the record citation indicates that he actually told Knepper about it.

### III.  CONCLUSION

For the above-stated reasons, we REVERSE the district court's denial of the defendants' motion for summary judgment to the extent that it sought qualified immunity for Flynn, Knepper, and Quinlan for the wrongful arrest claim and for Flynn and Quinlan for the excessive force claim. We AFFIRM the district court's denial of the motion for qualified immunity for Knepper for the excessive force claim. And we REMAND this case for proceedings consistent with this opinion.

ROVNER, *Circuit Judge,* concurring. Given this circuit's seemingly broad tolerance for the use of physical restraints during investigatory detentions, I agree with my colleagues that it would not have been clear to the defendants that handcuffing Rabin and placing him in the back of a squad car constituted an arrest that required probable cause to believe he had committed a crime. Consequently, the defendants are entitled to qualified immunity on the wrongful arrest claim. I write separately to explain why, in my view, the restraints placed on Rabin were not justified by the circumstances of this investigatory detention and transformed the deputies'

encounter with Rabin from a *Terry* stop into a wrongful arrest. As a result of our decision in *Moore v. Madigan*, 702 F.3d 933 (7th Cir. 2012), *reh'g en banc denied*, 708 F.3d 901 (7th Cir. 2013), the carrying of firearms in public by private citizens may soon become much more common than it heretofore has been in Illinois, and if so there are likely to be many more investigatory stops like this one to ascertain an individual's authority to carry a firearm. Law enforcement agents must understand and respect the limits on such *Terry* stops, and we must be clear on what those limits are.

The Supreme Court's decision in *Terry v. Ohio* recognized a "narrowly drawn" exception to the traditional rule that seizures of the person must be supported by probable cause to believe the individual has committed a crime. 392 U.S. 1, 27, 88 S. Ct. 1868, 1883 (1968). *See Florida v. Royer*, 460 U.S. 491, 498-99, 103 S. Ct. 1319, 1324-25 (1983); *Dunaway v. New York*, 442 U.S. 200, 208-210, 99 S. Ct. 2248, 2254-55 (1979); *United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985). A *Terry* stop is meant to be a minimal detention, lasting only so long, and intruding on the stopped individual's liberty only so much, as is necessary for an officer to either confirm or dispel a reasonable suspicion that the stopped individual "has been, is, or is about to be engaged in criminal activity." *United States v. Bullock*, 632 F.3d 1004, 1014-15 (7th Cir. 2011) (quoting *United States v. Vega*, 72 F.3d 507, 515 (7th Cir. 1995)); *see also United States v. Brignoni-Ponce*, 422 U.S. 873, 881-82, 95 S. Ct. 2574, 2580 (1975); *Adams v. Williams*, 407 U.S. 143, 145-46, 92 S. Ct. 1921, 1923 (1972). It is because an investigatory stop is meant to be brief and minimally intru-

sive that the Supreme Court authorized such a deten-
tion on a showing of reasonable suspicion rather than
probable cause. *See United States v. Place*, 462 U.S. 696, 703,
103 S. Ct. 2637, 2642 (1983); *Dunaway*, 442 U.S. at 210-11,
99 S. Ct. at 2255-56. The reasonableness, and hence
the lawfulness, of the stop therefore depend in part on
the degree of restraint imposed on the individual.
*Bullock*, 632 F.3d at 1014-15. "Police restraint may
become so intrusive that, while not technically an arrest,
it becomes tantamount to an arrest requiring probable
cause." *Id.* at 1016 (citing *United States v. Tilmon*, 19 F.3d
1221, 1224 (7th Cir. 1994)) (internal quotation marks
omitted).

"Handcuffs are generally recognized as a hallmark of a
formal arrest." *United States v. Newton*, 369 F.3d 659, 676
(2d Cir. 2004) (coll. cases). Certainly this is true as a
matter of appearance: because handcuffing is a typical
step in effectuating an arrest, people see someone in
handcuffs and reflexively think, "That person is going
to jail." And no one in handcuffs thinks, "I am free to
leave." More to the point, he is *not* free to leave. Short
of locking someone behind bars, there is no more
concrete and effective way to limit his movement and
thereby deprive him of his physical freedom. Once in
cuffs, a person's ability to terminate the encounter and
continue on his way depends not only on cooperating
with the officer and dispelling his suspicions, but on the
officer's willingness to remove the handcuffs and
restore his liberty. All of this is doubly true when the
handcuffed individual is placed in the back of a police

car.[1] *See United States v. Smith*, 3 F.3d 1088, 1097 (7th Cir. 1993) (Once the defendant was patted down, handcuffed, and told to sit in a specific place by the side of the road, he "was not free to go anywhere. His movement was curtailed as if he were handcuffed to a chair in a detective's office or placed in a holding pen in a station house or put behind bars."); *United States v. Brown*, 233 F. App'x 564, 567 (7th Cir. 2007) (non-precedential decision) ("It is obvious that Brown was seized; his movements were restrained when he sat handcuffed and locked in the squad car and he clearly was not free to leave. Moreover, the officers had initially acquired physical control over him at the time they tackled him, sprayed him with pepper spray, and cuffed

---

[1] My focus in this concurrence will be on the use of handcuffs. Rabin, of course, was not only handcuffed but placed in the back of a caged squad car. Needless to say, placing someone in the back of a police car against his will is itself a restraint on his freedom. Much of what I have to say about the decision to place Rabin in handcuffs will therefore apply to the additional decision to secure him in the squad car. There may well be situations in which having someone sit in a police car will be justified by something other than a need to restrain him: to protect him from others, to shelter him from the weather, or to proceed with the *Terry* stop in a more convenient setting, where the officer questioning the person has access to a computer terminal, for example. No such justification is evident from the facts in this case; it appears that Rabin was placed in the car solely as a means of restraining him. That additional restraint only compounded the intrusiveness of the encounter.

him. Obviously, any reasonable person in Brown's position at that time in the arrest scenario would have considered himself or herself restrained, beyond the limited *Terry*-like stop, and under 'arrest.' ").

Nonetheless, beginning with our decision in *United States v. Glenna*, 878 F.2d 967 (7th Cir. 1989), we have recognized a very limited set of circumstances in which police may place an individual in handcuffs without thereby converting a *Terry* stop into a de facto arrest. Our holding in *Glenna* was founded on evidence that gave police officers reason to be concerned for their safety as they confronted the defendant and attempted to determine whether he was engaged in a crime. The police were observing Glenna based on a Teletype alert indicating that he was involved in a recent drug deal, that he had $100,000 in cash with him, that he was armed, and that he also had some type of explosive device. An officer stopped Glenna when he pulled his van into a gas station, an environment in which firearms and explosives posed even more of a danger than they otherwise would. When, early in the encounter, the officer asked Glenna to produce his identification, Glenna reached into his pocket and the officer observed a bulge in the pocket which he correctly suspected might be an ammunition clip. The officer immediately grabbed Glenna's hand and removed the loaded clip from the pocket. At that point, the officer placed Glenna in handcuffs before frisking him. The patdown revealed that Glenna also had a small, explosive "cherry bomb" in a pants pocket. In view of the Teletype indicating that Glenna was potentially armed and dangerous, coupled

with the initial discovery of a loaded clip of ammunition on his person, we concluded that it was reasonable to believe that Glenna posed a risk to the safety of the officer who initiated the stop and the others who soon arrived on the scene. That risk entitled officers not only to hand-cuff Glenna while he was patted down (whereupon the "cherry bomb" was discovered) but to keep him in handcuffs while the officers attempted to confirm or dispel the suspicions of criminal activity raised by the Teletype (which efforts ultimately led to the discovery of a pipe bomb in the van Glenna was driving):

> [W]e are unwilling to hold that under *Terry*, the placing of a suspect in handcuffs without probable cause to arrest is *always* unlawful. If, in a rare case, "common sense and ordinary human experience" convince us that an officer believed reasonably that an investigative stop could be effectuated safely only in this manner, see [*United States v.*] *Sharpe*, 470 U.S. [675] at 685, 105 S. Ct. [1568] at 1574 [(1985)], "we will not substitute our judgment for that of the officers as to the best methods to investigate." See [*United States v.*] *Boden*, 854 F.2d [983] at 993[(7th Cir. 1988)].

878 F.2d at 972-73 (emphasis in original).

Subsequent cases have likewise sustained the use of handcuffs during *Terry* stops when the circumstances suggested either that an individual stopped for ques-tioning might have a weapon or that he might be involved in criminal activity often associated with vio-lence. *See, e.g., United States v. Smith*, 697 F.3d 625, 632 (7th

Cir. 2012) (suspected bank robber left alone with single agent while other agents chased his fleeing accomplices); *United States v. Hopewell*, 498 F. App'x 609, 611 (7th Cir. 2012) (non-precedential decision) (officers had tip defendant might be concealing gun); *Bullock*, 632 F.3d at 1016 (officers were searching for drugs, and drugs are associated with dangerous and violent behavior and thus warrant extra caution); *United States v. Snowden*, 250 F. App'x 175, 181 (7th Cir. 2007) (non-precedential decision) (agents had reason to believe defendant was about to engage in substantial drug transaction); *United States v. Shoals*, 478 F.3d 850, 853 (7th Cir. 2007) (per curiam) ("inherent danger" posed by defendant, who matched late-hour 911 report of individual engaging in gunfire, was wearing coat indoors, and had attempted to hide from police); *United States v. Stewart*, 388 F.3d 1079, 1085 (7th Cir. 2004) (defendant matched description of armed perpetrator of recent bank robbery and behaved suspiciously); *United States v. Hendricks*, 319 F.3d 993, 1004 (7th Cir. 2003) (defendant took abnormally long time to respond to request for identification and vehicle registration, he fumbled with something officer could not see, and ammunition magazine was found on his person during patdown); *United States v. James*, 40 F.3d 850, 875 (7th Cir. 1994) (police had received tip of suspicious activity in hotel room, a loud argument had been heard there, and gun and cash were discovered in room), *cert. granted & judgment vacated on other grounds*, 516 U.S. 1022, 116 S. Ct. 664 (1995).

A second line of cases has relied on the risk of flight to justify the use of handcuffs while the detained indi-

vidual is being questioned. *See, e.g.*, *Bullock*, 632 F.3d at 1016 (officers had reason to believe suspected cocaine dealer presented flight risk in addition to safety risk, given his knowledge that police had warrant to search residence where he made his cocaine sales); *United States v. Carlisle*, 614 F.3d 750, 756 (7th Cir. 2010) (defendant attempted to escape house with backpack during drug sweep); *United States v. Wilson*, 2 F.3d 226, 231-32 (7th Cir. 1993) (defendant had attempted to flee); *Tom v. Voida*, 963 F.2d 952, 958-59 (7th Cir. 1992) (defendant had disobeyed multiple orders to stop).

These decisions are consistent with our observation in *Glenna* that it will be the rare case in which it will be necessary, and thus consistent with the purpose and scope of a *Terry* stop, to temporarily immobilize a person with handcuffs while a police officer attempts to confirm or dispel a reasonable suspicion of criminal activity. There is an obvious dissonance between the use of handcuffs, which signals an arrest, and a *Terry* stop, which is meant to be a modest seizure short of and distinct from an arrest. Authorizing the use of handcuffs when the purpose of the *Terry* stop cannot be accomplished without them—when the person being questioned would otherwise flee, or when he would otherwise pose a danger to the officers doing the questioning—reconciles the conflict in a logical way. *See Glenna*, 878 F.2d at 974-75 (Flaum, J., dissenting). Those cases should be few and far between, and the facts justifying the application of an arrest-like restraint should be concrete and compelling. *See United States v. Chaidez*, 919 F.2d 1193, 1197-98 (7th Cir. 1990) (the more intrusive the

seizure, the more justification for the seizure there must be).

Yet, despite the limits evident in the foregoing deci-sions, we occasionally make statements suggesting that the use of handcuffs during *Terry* stops is something less than a rare occurrence requiring particularized factual justification. We sometimes remark, for example, that the use of handcuffs by itself does not necessarily transform an investigatory stop into a de facto arrest, without adding that handcuffs will be justified only in the *un*usual case—almost as if we are indulging a rebuttable presumption that handcuffs are consistent with a standard *Terry* stop. *See, e.g.*, *Carlisle*, 614 F.3d at 756; *Shoals*, 478 F.3d at 853; *United States v. Robinson*, 30 F.3d 774, 782 n.3 (7th Cir. 1994); *Smith*, 3 F.3d at 1094-95. On other occasions we have observed that "[f]or better or for worse, the trend [of cases granting greater latitude to employ force during a *Terry* stop] has led to the permit-ting of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention," as if to suggest that we will, inevitably, continue to broaden the range of circumstances in which forcible restraint may be used during *Terry* stops. *Tilmon*, 19 F.3d at 1224-25; *Vega*, 72 F.3d at 515; *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005); *see also Stewart*, 388 F.3d at 1084 ("The permissible scope of a *Terry* stop has expanded in recent years to include the use of handcuffs and temporary detentions in squad cars."). When divorced from their context, statements along these lines could be

read to imply that we no longer regard the use of hand-cuffs during *Terry* stops as the exception but rather the rule.

It would be unfortunate (and mistaken) for police departments and their attorneys to take that message from our case law. In fact, we have always demanded that there be some reason for police officers to believe that handcuffing a stopped individual is *necessary* to effectuate the legitimate purpose of an investigatory detention, be it to prevent an uncooperative person from fleeing or to preserve officer safety. Even the one case in this line that represents a departure from its predecessors ultimately makes this same point. In *United States v. Yang*, 286 F.3d 940, 950 (7th Cir. 2002), we sustained the use of handcuffs while a defendant suspected of attempting to smuggle opium into the country was transported from a domestic airport terminal to the international terminal for questioning. We candidly acknowledged that the circumstances were different from those in prior cases, in that the defendant did not pose a threat to the officers questioning him nor did he pose a flight risk. *Id.* at 950. Yet, logistically it was necessary for investigative purposes to transport the defendant by van to the international terminal, where drug testing equipment was available. And the ride from terminal to terminal took the defendant across the airport tarmac, a highly-restricted area in which the presence of *any* unauthorized, unrestrained individual posed a safety risk. *Id.* The generalized but heightened need for safety in an especially sensitive environment thus supported the use of hand-

cuffs notwithstanding the absence of any indication that this defendant in particular posed a threat. In that regard, circumstances warranting the temporary use of handcuffs in *Yang* were "quite unique." *Id.* Thus *Yang*, in distinguishing our other cases, ultimately confirms that the range of circumstances in which handcuffs may be used is narrow. Even if those circumstances have turned out to be not quite as rare as we envisioned in *Glenna*, they are nonetheless limited and definite.

However, given our failure as a court to make explicit the limits which I believe are implicit in the facts and rationale of our decisions, along with our occasionally uncabined language regarding the use of handcuffs during *Terry* stops, I must join my colleagues in holding that the defendants here are entitled to qualified immunity. The defendants are entitled to such immunity unless the right they are accused of violating was clearly established at the time of their actions, *e.g.*, *Hernandez v. Sheahan*, 711 F.3d 816, 817 (7th Cir. 2013); and whether that right was clearly established must be answered with reference to the specific facts of the case rather than at a high level of generality, *e.g.*, *Surita v. Hyde*, 665 F.3d 860, 868 (7th Cir. 2011); *Borello v. Allison*, 446 F.3d 742, 750 (7th Cir. 2006); *Carlson v. Gorecki*, 374 F.3d 461, 466 (7th Cir. 2004). Thus, the question is not whether it was clear, in December 2009, that Rabin had a Fourth Amendment right not to be arrested absent probable cause to believe he had committed a crime; that much is beyond dispute. The question, rather, is whether it would have been clear to a reasonable police officer that handcuffing someone in the course of a *Terry*

stop initiated to determine that person's authority to carry a firearm in public—when the firearm has already been taken from him—transformed the stop into a de facto arrest requiring probable cause. I agree that the answer to that question is "no." Determining whether and when an investigatory detention becomes an arrest is a highly fact-dependent inquiry. *E.g.*, *Stewart*, 388 F.3d at 1085. We have described the line between the two as "dim and wavering." *United States v. Lechuga*, 925 F.2d 1035, 1039-40 (7th Cir. 1991). And I can identify no prior case making clear that the use of handcuffs in the scenario presented here would take an investigatory detention across that difficult-to-discern boundary. In view of our statements about the "trend" toward allowing the use of handcuffs and other forcible restraints during *Terry* stops, and our continuing reaffirmation that the use of handcuffs will not necessarily transform such a stop into an arrest, I believe that a reasonable officer could have thought the use of handcuffs was consistent with the permissible purpose and scope of the stop, particularly one involving a firearm. Officer safety has been a recurring theme in our cases sustaining the use of handcuffs during investigatory detentions. And although Rabin claimed a legal right to carry his firearm—which he had readily surrendered to Flynn at the beginning of the encounter—an officer might have reasonably thought that he was free to handcuff any individual being investigated for the possible illegal possession of a weapon in the name of safety, without transforming the investigatory stop into an arrest.

That said, I am compelled to point out that none of the concerns we have previously cited to authorize the use

of handcuffs during a *Terry* stop was present here. The sole basis for the detention of Rabin was his carrying of a firearm. There was no report or ground on which to suspect that he had misused the weapon or committed any crime apart from the (potentially) illegal possession of a firearm in public; the police stopped Rabin on no basis other than the fact that he had a gun. He exhibited no suspicious, evasive, or aggressive behavior. He was calm and cooperative, responded appropriately to Flynn's inquiries, and presented to Flynn evidence of his identity, his status as a licensed private investigator, and his authority to carry a firearm. Knepper would later confirm that Rabin had served a court order on a tenant of the building, just as he had represented to Flynn. Whatever risk to officer safety Rabin's possession of the weapon might have posed at the outset of the encounter was eliminated when Flynn took possession of the weapon. Nothing suspicious was discovered during the subsequent frisk of Rabin's person. Apart from the possibility that Rabin's possession of the weapon in public might have been illegal (notwithstanding his Firearm Control Card or "Tan card"), there was no basis to believe that he posed an independent threat to the officers. Rabin never made any attempt to flee. In short, there was no need to handcuff Rabin and then secure him in a police car in order to effectuate the purpose of the *Terry* stop; the notion that physical restraint was justified became altogether spurious once other deputies had joined Flynn at the scene. Rabin's authority to carry the firearm could have been ascertained without handcuffing him and locking him away in a caged squad car.

To conclude otherwise would be to suggest that carrying a firearm in public will routinely justify not only a *Terry* stop but the highly intrusive, physical restraint on liberty that handcuffing represents. I can, of course, appreciate the need for police caution in approaching someone they know or suspect is armed. But if the carrying of concealed firearms in Illinois is on the verge of being legalized broadly, as our decision in *Moore* may portend, then the possession of a gun in public cannot by itself be reason to suspect that a stopped person poses a danger that justifies an arrest-like restraint. Once such an individual claims the right to lawfully carry the firearm, presents documentation to that effect, and has surrendered the firearm to the officer without incident while his authority is being checked, I can see no need for physical restraint absent some additional information suggesting he or she poses a potential danger to the officer or is about to flee. Short of jailing a person, I can imagine no greater intrusion on his freedom than placing him in manacles and installing him in the back of a caged police car. *See Terry*, 392 U.S. at 8-9, 88 S. Ct. at 1873 ("'No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or the interference of others, unless by clear and unquestionable authority of law.'") (quoting *Union Pac. R.R. Co. v. Botsford*, 141 U.S. 250, 251, 11 S. Ct. 1000, 1001 (1891)); *Arizona v. Evans*, 514 U.S. 1, 23, 115 S. Ct. 1185, 1197 (1995) (Stevens, J., dissenting) (citing the mistaken arrest, handcuffing, and search of an individual in a public street as an "offense to the dignity of the citizen"); *Love v. City of*

*Port Clinton*, 524 N.E.2d 166, 167 (Ohio 1988) ("The acts of subduing and handcuffing are undoubtedly offensive to a reasonable sense of personal dignity.") (internal quotation marks omitted). Allowing such restraints to be imposed absent some indicia of danger would be a heavy tax on the right to carry a firearm; a right that comes at such an expense arguably is no right at all.

A final word about the length of the stop in this case. Rabin was detained for 90 minutes, which was far too long given the purpose of the stop. *Cf. Place*, 462 U.S. at 709-10, 103 S. Ct. at 2645-46 (90-minute detention of defendant's luggage was excessive under *Terry*: "we have never approved a seizure of the person for the prolonged 90-minute period involved here and do not do so on the facts presented by this case"). The delay in releasing Rabin was due to the fact none of the three deputies knew what a Tan card was and no one (including the dispatcher) knew how to verify Rabin's authorization to carry a firearm. This pervasive ignorance suggests a failure on the part of their employer to train them adequately. I presume that this case represents an aberration, and that if and when the carrying of firearms by private citizens becomes more common in Illinois, confirming an individual's authority to carry a firearm in public will become a routine and quick task. (I also presume that Illinois will issue a more reliable means of identifying those authorized to carry weapons; the Tan card, which does not bear a photograph of the bearer, is little more reliable and secure from forgery than a library card.) Still, there will no doubt be future instances in which there is some discrepancy in the gun holder's identification or there is some

system failure that makes it impossible for an officer to promptly confirm an individual's authorization to carry a firearm. As my colleagues point out, Rabin's counsel conceded at oral argument that the defendants could properly detain Rabin until such time as they confirmed the legitimacy of his Tan card. That concession makes it unnecessary for us to decide in this case whether the deputies were obligated to release Rabin once it became clear that they could not quickly ascertain whether he was legally authorized to carry a gun. I would just note, as my colleagues do, that authorities in this situation always have the option of releasing the individual and retaining his firearm while they investigate his authority to carry the gun. *See*, *e.g.*, *Schubert v. City of Springfield*, 589 F.3d 496, 503 (1st Cir. 2009) (when, after five minutes of checking, officer was unable to confirm validity of detainee's gun license due to lack of centralized database, officer told detainee he was free to go and could retrieve his gun and gun license from the police department at a later time). Detaining an individual's firearm typically will not interfere with his freedom to the extent that detaining a traveler's luggage might, *cf. Place*, 462 U.S. at 708-09, 103 S. Ct. at 2645, and would be consistent with the Supreme Court's admonition that "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, 460 U.S. at 500, 103 S. Ct. at 1325-26.

It is for these reasons that I concur in the court's decision.