In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 07-2224

LAURA PHELAN,

*Plaintiff-Appellant,*

*v.*

VILLAGE OF LYONS and DAMIEN DYAS,

*Defendants-Appellees.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 04 C 8327—**George M. Marovich**, *Judge.*

_____

ARGUED JANUARY 7, 2008—DECIDED JUNE 27, 2008

_____

Before POSNER, ROVNER, and WOOD, *Circuit Judges*.

ROVNER, *Circuit Judge*. As she was driving through the Village of Lyons en route to the North Riverside Mall, Laura Phelan was pulled over and arrested. Officer Damien Dyas executed the traffic stop based on his belief that Phelan was driving a stolen vehicle. His belief turned out to be mistaken, and Phelan was released shortly

thereafter. She sued the Village of Lyons[1] and Officer Dyas under 42 U.S.C. § 1983, alleging violations of her rights under the Fourth Amendment. On the parties' cross-motions for summary judgement, the district court granted Officer Dyas's motion for summary judgment on qualified immunity grounds. Phelan appeals, and for the reasons explained in this opinion, we reverse the grant of summary judgment to Officer Dyas and remand for further proceedings.

I.

Shortly after 5:30 p.m. on October 14, 2004, Village of Lyons police officer Damien Dyas was nearing the end of his 12-hour shift. He decided to run a random license check on the white Cadillac sedan driving in front of him. Laura Phelan was driving the car, which bore the license plate number 1020. After entering the plate number into a computer in his squad car, Officer Dyas received what is referred to as a LEADS report on the computer screen in his car.

The first screen of the LEADS report contained, among other things, the date and time of Officer Dyas's query, the status of the vehicle registered to the plate in question (either "valid," "stolen," or "suspended"), and a description of a vehicle. As relevant here, the second line relayed that the vehicle registered to plate 1020 was "stolen."

---

[1] In her amended complaint Phelan conceded that she had no federal claims against the municipality. Because the district court dismissed the state-law claims against the Village (a ruling she does not appeal), we do not discuss any of Phelan's claims against the Village of Lyons.

The third line contained the description for the "stolen" vehicle: a black 2002 Honda motorcycle (relayed on the LEADS screen in acronyms as "DOT/081504 VCO/BLK VYR/02 VMA/HD VMO/CYL VST/MC"). Unfortunately, Officer Dyas did not see this description of the stolen vehicle. Instead, he read only as far as the second line stating that plate 1020 belonged to a stolen vehicle. He thus had no occasion to confront the obvious discrepancy between the vehicle description (black Honda motor-cycle) and the vehicle in front of him (white Cadillac). As the parties explained at oral argument, this discrepancy arose on account of the confusing Illinois licensing system for automobiles and motorcycles: the license plates for both vehicles may have the same number, and are distinguishable by virtue of the fact that motorcycle plates are smaller in size than car plates[2], a fact any trained law enforcement officer would know.

After reading lines one and two of the LEADS report, Officer Dyas contacted the dispatcher and reported that he was following a possible stolen motor vehicle. In response to Officer Dyas's query, the dispatcher confirmed that license plate 1020 belonged to a stolen vehicle, and Officer Dyas's location was relayed to assisting officers who arrived at the scene shortly. In the interim, Officer Dyas

---

[2] The Illinois Secretary of State's website identifies one excep-tion to this rule: special "ham radio operator" plates are avail-able only as a larger "passenger sized plate," even when used on a motorcycle. *See* http://www.cyberdriveillinois.com/ departments/vehicles/license_plate_guide/ (follow "Standard License Plates" hyperlink; then follow "Amateur Radio" hyperlink).

continued to follow Phelan's Cadillac[3] until she stopped at a railroad crossing. At that point Officer Dyas and the arriving back-up officers conducted a "felony-traffic stop." After activating his emergency lights and signaling Phelan to pull over, Officer Dyas instructed Phelan to turn off her vehicle and throw her car keys out of the window. She was then told to exit her vehicle and walk backwards until officers were able to place her in handcuffs and secure her in the squad car. After Officer Dyas searched Phelan's car, he learned through dispatch the information that the third line of the LEADS report had disclosed: that the stolen vehicle was in fact a black Honda motorcycle. He then allowed Phelan to exit the squad car, removed the handcuffs, and released her.

As relevant here, Phelan sued Officer Dyas in his individual capacity, alleging that the stop violated her Fourth Amendment Rights. The district court granted Officer Dyas's motion for summary judgment after concluding that he was entitled to qualified immunity for the stop because he had a reasonable basis to believe that Phelan was driving a stolen vehicle.

## II.

On appeal, Phelan maintains that Officer Dyas was not entitled to qualified immunity for the felony traffic stop.

---

[3] Officer Dyas maintained in the district court that Phelan then engaged in what he characterized as evasive driving: swerving into the right-hand lane reserved for vehicles making a right turn and then traveling through the intersection without turning right. Phelan denied doing either of these things, and for purposes of summary judgment we credit her version of events.

We review the district court's decision de novo, asking whether, viewing the facts in the light most favorable to Phelan, Officer Dyas is nonetheless entitled to qualified immunity as a matter of law. *Boyd v. Owen*, 481 F.3d 520, 522 (7th Cir. 2007). Qualified immunity protects public officials in those situations where the law is not sufficiently clear for a reasonable official to have known that his actions were illegal. *See Saucier v. Katz*, 533 U.S. 194, 202 (2001); *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 687 (7th Cir. 2007). *Saucier* lays out a two-part test for qualified immunity. First, we consider whether, taken in the light most favorable to Phelan, the facts alleged amount to a constitutional violation. *Saucier*, 533 U.S. at 201; *Boyd*, 481 F.3d at 524 (reiterating *Saucier's* command to first determine whether plaintiff has alleged a constitutional violation). Second, we ask whether the right was clearly established at the time of the alleged violation. *Saucier*, 533 U.S. at 201; *Boyd*, 481 F.3d at 526. The "rigid" order of the *Saucier* test has been repeatedly criticized, *see, e.g.*, *Scott v. Harris*, 127 S. Ct. 1769, 1780-81 (2007) (Breyer, J., concurring), and the Supreme Court recently granted certiorari to consider whether *Saucier* should be overruled. *Pearson v. Callahan*, 128 S. Ct. 1702 (Mar. 24, 2008) (directing parties to brief and argue "Whether the Court's decision in *Saucier v. Katz*, 533 U.S. 194 (2001) should be overruled?"). Meanwhile, we adhere to *Saucier's* sequential approach.

As for the first prong, we conclude that the facts as alleged by Phelan establish a constitutional violation by Officer Dyas. A traffic stop and accompanying detention constitute a seizure under the Fourth Amendment, which protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable

searches and seizures." Thus, an automobile stop violates the Constitution if it is "unreasonable" under the circumstances. *See Whren v. United States*, 517 U.S. 806, 809-10 (1996). A stop is reasonable if the officer has "probable cause to believe that a traffic violation has occurred." *Id.* at 810. The question here then is whether the LEADS report gave Officer Dyas such probable cause.

Under the circumstances, it did not. Although the first two lines of the LEADS report standing alone might have provided a basis for the stop, we cannot ignore the information contained in the third line, which appeared on the initial screen returned in response to Officer Dyas's query. In that line, the stolen vehicle is described as a black Honda motorcycle. If Officer Dyas had read this line, he would have realized, at the very least, that further investigation was warranted before initiating a felony traffic stop. Indeed, if Officer Dyas had read the third line of the LEADS printout and nonetheless concluded further investigation or a brief investigatory stop was warranted on the basis of the confusing Illinois license plate system, we might have a different case. *Cf. United States v. Cashman*, 216 F.3d 582, 587 (7th Cir. 2000) ("[T]he Fourth Amendment requires only a reasonable assessment of the facts, not a perfectly accurate one."). Here though, Phelan has established that there was in fact no basis for her detention, and Officer Dyas has responded with an admission that he failed to read the information in front of him that would have alerted him to that fact. Because Phelan's Cadillac was not in fact stolen, and Officer Dyas would have known that had he read line three of the LEADS report he requested, there was no probable cause and the felony traffic stop was unreasonable under the circumstances. *See Jones v. Wilhelm*, 425 F.3d 455, 461 (7th

Cir. 2005) ("In determining whether a defendant's alleged actions violated a clearly established right, courts may properly take into account any information the defendant ought reasonably to have obtained.").

Having concluded that Officer Dyas's decision to stop Phelan and handcuff her violated her Fourth Amendment right to be free from unreasonable seizures, we next consider whether that right was clearly established at the time of the stop. *See*, *e.g.*, *Saucier*, 533 U.S. at 200; *Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008). Undoubtedly the Fourth Amendment's general proscription against unreasonable seizures was clearly established at the time Officer Dyas stopped Phelan. Our inquiry, however, is whether the application of that right to this particular set of circumstances is clear enough that a "'reasonable official would understand that what he is doing violates that right.'" *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

Instead of focusing on the contours of the right to be free from unreasonable seizures itself, Officer Dyas argues that his behavior under the circumstances was reasonable. Phelan construes this argument as an attempt by Officer Dyas to append a "third prong" to the qualified immunity inquiry: namely, whether the officer's actions were reasonable even if they violated clearly established law. As Phelan points out, we rejected this precise line of argument in *Jones*. *Jones* dealt with an officer who mistakenly entered the wrong apartment when executing a search warrant. *Jones*, 425 F.3d at 459-60. The officer in *Jones* urged the panel to assess whether his actions were reasonable under the circumstances, notwithstanding any violation of clearly established law. *Id.* at 460. Alternatively, he suggested that in making the inquiry into

whether it would have been clear to a reasonable officer that his actions violated the constitution, the court impute to the hypothetical reasonable officer only the information the defendant had at the time, "and not the knowledge he ought reasonably to have amassed during the execution of the warrant." *Id.* at 461. We rejected both arguments, noting that, "[i]t goes without saying that the reasonableness of an official's actions is not a factor in determining whether the facts as alleged constitute a violation of constitutional rights." *Id.*

That said, Officer Dyas correctly notes that we may still take into account an officer's reasonable, but mistaken beliefs as to the *facts* establishing the existence of probable cause. *See Saucier*, 533 U.S. at 206. Officer Dyas essentially argues that based on the information he received, it was reasonable for him to mistakenly believe that Phelan's automobile was the stolen vehicle described in the LEADS report and thus that he had probable cause for the stop. But we have already concluded that Officer Dyas's mistake was not a reasonable one. The third line of the LEADS report appeared on the same screen as the second line. Officer Dyas need not have expended more than an additional instant of attention to see the vehicle description on line three. Given the circumstances under which he was following Phelan, that additional instant would not have been hard to come by.

The justifications Officer Dyas advances for failing to read line three of the LEADS report do not change our assessment. First, he suggests that because he was pursuing a possible stolen vehicle, he had neither the luxury nor the time of an officer sitting at a desk perusing a computer screen or informational printout. Although Officer Dyas was in the field following Phelan's car, it

was hardly a hot pursuit situation. Officer Dyas's decision to run Phelan's plates was not prompted by any suspicious behavior on Phelan's part, and it is undisputed that he had time to take a number of steps after receiving the response to his initial query. He called his dispatcher to verify the stolen vehicle; he continued following Phelan; and he awaited the arrival of back-up officers. Ultimately, he executed the stop only after Phelan had already come to a stop on account of a railroad crossing ahead. And at this stage of the proceedings, we credit Phelan's assertion that she did nothing unusual or evasive while Officer Dyas followed her. There is nothing in the sequence of events surrounding Officer Dyas's stop of Phelan to suggest that although he had time to read lines one and two of the LEADS report, it would have been impractical or otherwise difficult to read line three. This is so particularly since line three contains the crucial descriptive information about the "stolen" vehicle. Moreover, that the stop occurred during what Officer Dyas characterizes as an "extremely busy" time of day only reinforces our view that a reasonable officer would have read the third line: traffic was moving slowly and there is no evidence that Phelan could have made a quick escape.

Officer Dyas also claims that it was reasonable for him to rely on the dispatcher's response to his query about license plate 1020. After he received the LEADS report, Officer Dyas contacted the dispatcher and reported that he was following a possible stolen motor vehicle. Officer Dyas testified in his deposition that the dispatcher verified that "license plate 1020 came back to a stolen vehicle." But Officer Dyas's reliance on the dispatcher is misplaced—far from being either the sole or authoritative source on the matter, the dispatcher simply responded to Officer Dyas's query, which was founded on his erroneous

belief that the vehicle he was following was stolen. Although Officer Dyas's attempt to verify the status of the vehicle with the dispatcher certainly reinforces that his mistake was an innocent one, it does nothing to further his claim that the mistake, innocent as it may have been, was *reasonable*. His failure to review the information in front of him in his squad car cannot be excused by the dispatcher's response to his admittedly incomplete query.

In sum, we cannot conclude that Officer Dyas's failure to read the third line was objectively reasonable under the circumstances. We do not hold that a reasonable officer who had read the pertinent information in front of him could never have concluded that a stop was necessary. Indeed, if Officer Dyas had read the third line and still harbored the belief that a crime had been committed or that further investigation was warranted, we would have a different set of facts that may or may not represent a violation of a clearly established right. Here Phelan has advanced evidence that she was neither driving a stolen vehicle nor engaging in any traffic violation, and Officer Dyas has responded simply by admitting that in executing the stop he overlooked a crucial piece of information about the vehicle he was stopping. On this record, we conclude that Officer Dyas was not entitled to summary judgment on the basis of qualified immunity.

### III.

For the foregoing reasons, we REVERSE the decision of the district court granting summary judgment to Officer Dyas and REMAND for further proceedings.