In the

# United States Court of Appeals

## For the Seventh Circuit

No. 13-1985

MICHAEL SEISER,

*Plaintiff-Appellant,*

*v.*

CITY OF CHICAGO and DEBRA KIRBY,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 C 2353 — **James F. Holderman**, *Judge.*

ARGUED DECEMBER 13, 2013 — DECIDED AUGUST 12, 2014

Before EASTERBROOK, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Chicago police officer Michael Seiser was arrested and subjected to a breathalyzer examination after several witnesses reported seeing him drinking from an alcoholic beverage container while driving his personal vehicle. After the breathalyzer detected no alcohol in his bloodstream, he was cited for driving a motor vehicle with an open container of alcohol in the passenger compartment. That charge was dropped after testing of the contents of the container indicated

that it did not contain alcohol. Seiser filed suit against the City of Chicago (the "City") and the police deputy superintendent who had ordered him to be processed criminally, alleging various Fourth Amendment and state-law claims. R. 48; *see Seiser v. City of Chicago*, No. 12 C 2353, 2013 WL 1809916 (N.D. Ill. Apr. 29, 2013). The district court entered summary judgment in favor of the defendants on all claims. Seiser appeals, contending that probable cause did not support either the order that he undergo a breathalyzer examination or the open-container citation. We affirm.

## I.

On the afternoon of March 29, 2011, Officer Seiser was driving his private automobile between Tilden Career Community Academy High School in Chicago's Canaryville neighborhood to the nearby intersection of 50th Street and Union Avenue, where Seiser was assigned to stand post until 4:00 p.m. as part of the City's Operation Safe Schools program. Seiser was on duty and in uniform as a police officer.[1]

Seiser was making an effort to consume extra water as part of a weight-loss program. Toward that end, he had a large bottle of water with him in the car and in fact was drinking from it while en route to his assigned post. In retrospect, his choice of bottle was not the most prudent: the bottle was a 1.75-liter T.G.I. Friday's Mudslide bottle which, when sold, had

---

[1]   Seiser's work with the school safety program was secondary employment, but there is no dispute that he was nonetheless considered to be on duty as a police officer while engaged in that work.

contained an alcoholic beverage and which still bore a label that read, "The liquor is in it."

Gail Glassford (a private employee of the Safe Schools program), her mother Kathleen Glassford, and Roseann Anderson all saw Seiser drinking from the bottle as he drove by them in the 4800 block of South Union Avenue. All perceived the bottle as one containing liquor based on the bottle's size, shape, and labeling.

Gary Anderson, a private school security guard and Roseann's brother, was stationed at the same intersection (50th Street and Union Avenue) as Seiser was. Roseann called her brother and asked him to obtain the license plate number from Seiser's car, which Seiser had just parked across the street from where Gary was standing. As he was talking with Roseann, Gary could see the driver of the car drinking from what looked like a bottle of vodka. Gary subsequently walked across the street, copied down the plate number, and was about to return to his post when Seiser emerged from the car and confronted him. Gary would later report that Seiser staggered as he exited the vehicle and that his breath smelled of alcohol. As Gary used his hand-held radio to summon his supervisor, Seiser got back into his car and drove back to the high school.

At 2:18 p.m., Kathleen Glassford called 911 to report that she had seen someone driving in the vicinity of 50 Street and Union Avenue drinking vodka while driving; she described the car and supplied its license plate number. When police checked the plate number, they discovered the car was registered to Seiser. Kathleen Glassford placed another call to the police at

2:29 p.m. to add that the driver of the car was a police officer and to request that a police supervisor respond to her report.

Sergeant John Verta of the Chicago Police Department ("CPD") was dispatched to investigate the incident. He spoke with both Gail Glassford and Roseann Anderson, who told him they had seen a police officer driving while drinking from a gallon-sized bottle of vodka. They also directed him to the intersection several blocks away, where Seiser's automobile was once again parked.

As Verta approached Seiser's vehicle from the passenger side, he saw on the front passenger seat a large bottle with the seal broken and with clear liquid inside. Although Verta could not read the bottle's red and white label, which was turned toward the seat, he believed based on the size of the bottle and what Glassford and Anderson had told him that it contained alcohol. Verta summoned Seiser, who was standing not far away, and asked him what was in the bottle. Seiser replied, "What bottle?" When Verta indicated the bottle inside of the car, Seiser—by his own account, which we credit—said that the bottle did not contain alcohol. But when Verta asked him to open the car and turn the bottle over to him, Seiser demurred after ascertaining that Verta had neither a warrant nor an signed affidavit from a complaining witness. "No, get a warrant. I know my rights," he told Verta. Verta reiterated his request but again met with Seiser's refusal. When Verta related to Seiser what the witnesses had told him, Seiser offered to accompany Verta back to the station and submit to a breathalyzer examination in order to demonstrate that the complaint was false. Verta contacted his watch commander,

Captain Robert Johnson, who instructed Verta to bring Seiser into the station. Verta drove Seiser to the Ninth District station.

At this point, the Internal Affairs Division ("IAD") of the CPD became involved in the matter. After the call from Verta, Johnson contacted IAD Lieutenant David Naleway to inform him that a police officer had reportedly been drinking while on duty. Naleway in turn dispatched two IAD officers—Sergeants Matthew Price and Terrance Cochran—to the Ninth District station. After Price was briefed on the allegations against Seiser, he visited the scene of the incident and conducted his own investigation. He spoke with Gail Glassford as well as Gary and Roseann Anderson, all three of whom reiterated that they had seen a uniformed police officer drinking from what appeared to be bottle of alcohol while driving. Roseann Anderson signed an affidavit to that effect. Price also examined Seiser's vehicle (which was still parked near the high school) and saw the large bottle in the front seat. Price too thought that the bottle was a liquor bottle, and he could see that it contained a clear liquid. An evidence technician photographed the bottle *in situ*.

Price reported back to Naleway and conveyed what the witnesses had told him and what he had seen in Seiser's car. That information was communicated up the chain of command to Deputy Superintendent Debra Kirby, who headed the CPD's Bureau of Professional Standards. Kirby's assigned duties included oversight of the IAD, among other divisions. Kirby instructed Rivera to have Seiser processed criminally for DUI (*i.e.*, arrested) at the Ninth District, and to recover the bottle from Seiser's car. She also directed that the IAD conduct an

administrative investigation into the incident once the criminal investigation was complete.

Once informed of Kirby's orders, Johnson briefed officers Brian Madsen and Andrew Kral and assigned them to proceed with the criminal investigation and processing of Seiser. They met Seiser at the Ninth District station and at 4:45 p.m. began to process him. They administered field sobriety tests, which Seiser passed. They then ordered him to submit to a breathalyzer test, which the record indicates took place at 5:07 p.m. (Although the defendants aver that Seiser submitted to the test voluntarily, and it is agreed that Seiser had previously suggested the breathalyzer to Verta, Seiser contends that he withdrew his consent once he learned that he was being arrested. In any case, he submitted to the breathalyzer.) The test result indicated a blood-alcohol content of 0.000. An arrest report was completed, and upon reviewing it, Captain Johnson ordered that Seiser be released without a DUI charge. Sergeants Verta and Cochran decided that, in view of the open liquor bottle in his vehicle, Seiser should be cited for an open-container violation, and Madsen wrote the citation accordingly.

At that point in the process, the IAD administrative investigation commenced. Sergeants Cochran and Price solicited Seiser's consent to search his vehicle and to retrieve the bottle, but Seiser refused. The two sergeants then gave Seiser a written order to allow the recovery of the bottle, and Seiser complied with the order: he was driven back to his vehicle, where he unlocked the car and handed over the bottle. The bottle and its contents were inventoried, and the latter were sent to the Illinois State Police laboratory for analysis.

On April 29, 2011, the laboratory issued a report indicating that the contents of the bottle contained no alcohol. At a court hearing on the open-container charge on May 18, Madsen advised the Assistant State's Attorney of the negative laboratory result. The court subsequently dismissed the charge.

Roughly one year later, Seiser filed the instant suit against Kirby and the City, asserting claims under both section 1983 and state law. Among the claims were the two at issue in this appeal: a Fourth Amendment claim against Kirby founded on the contention that the involuntary breathalyzer amounted to an illegal search, as there was no probable cause to believe that it would yield evidence of a crime and no warrant authorizing the search; and a state-law malicious prosecution claim against the City premised on the contention that there was no probable cause to believe Seiser had violated the open-container law.

The district court entered summary judgment in favor of the defendants on both of these claims. R. 48. The court rejected the wrongful search claim, reasoning that on the facts presented, the police had probable cause to arrest Seiser for driving under the influence and therefore grounds to administer the breathalyzer test. The court pointed out that three witnesses had told Sergeant Price they had seen Seiser drinking from what appeared to be a bottle of alcohol while driving, and Roseann Anderson had signed an affidavit to that effect. Gary Anderson had also reported smelling alcohol on Seiser's breath. Verta had found Seiser to be uncooperative when asked about the bottle, and Seiser had refused to turn the bottle over to Verta when asked. This evidence, in the district court's view supported a reasonable belief that Seiser had operated a motor vehicle while under the influence of alcohol, notwithstanding

certain discrepancies in the witness accounts and the fact that Verta did not observe any signs of intoxication in Seiser's appearance and behavior. R. 48 at 8–9. Moreover, it was reasonable for the police to administer the breathalyzer without first obtaining a warrant, in the court's view, given the speed at which alcohol leaves the bloodstream. R. 48 at 9.

The court likewise rejected the malicious prosecution claim, reasoning that the open-container charge was supported by probable cause. The bottle retrieved from Seiser's vehicle bore a label indicating that it contained liquor, and until the contents of the bottle were analyzed by a laboratory, the police had no way of knowing that the bottle did not, in fact, contain alcohol. R. 48 at 12. At that point, the charge against Seiser was dismissed. But until the testing proved negative, the City was justified in pursuing the charge. R. 48 at 12–13.

## II.

We review the district court's summary judgment decision *de novo. E.g.*, *Townsend v. Cooper*, No. 12-3620, — F.3d —, 2014 WL 3511731, at *5 (7th Cir. Jul. 17, 2014). We construe the evidence in the light most favorable to Seiser, granting him the benefit of all reasonable inferences and resolving all credibility disputes in his favor. *See id.* In this case, the pertinent facts are largely undisputed. The dispute, instead, focuses on whether the police (and Kirby in particular) had reasonable grounds to believe that Seiser had been driving while intoxicated and thus to subject him to the breathalyzer test; whether exigent circumstances justified the administration of that test without a warrant; and whether the City had probable cause to charge Seiser with an open-container violation.

A. Probable cause to administer the breathalyzer test

A breathalyzer examination constitutes a search implicating the Fourth Amendment. *See Maryland v. King*, 133 S. Ct. 1958, 1969 (2013) (citing *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 616, 109 S. Ct. 1402, 1413 (1989)). As such, it must be supported by probable cause to believe that the test will yield evidence of a crime. *See Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983); *United States v. Sutton*, 742 F.3d 770, 773 (7th Cir. 2014); *Herzog v. Vill. of Winnetka, Ill.*, 309 F.3d 1041, 1044 (7th Cir. 2002). If the Chicago police had probable cause to believe that Seiser had been driving while under the influence of alcohol, then they had a substantial basis on which to believe that the breathalyzer test would yield evidence of that offense. *See Schmerber v. California*, 384 U.S. 757, 770, 86 S. Ct. 1826, 1835 (1966). A police officer has probable cause to believe that an individual has committed an offense (and to make an arrest) if the facts and circumstances known to him would warrant a reasonable person believing that the individual has committed or is committing a crime. *E.g.*, *Williamson v. Curran*, 714 F.3d 432, 441 (7th Cir. 2013). The belief need not rise to the level of certainty. *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 714 (7th Cir. 2013).

> [A]lthough it requires something more than a hunch, probable cause does not require that it was more likely than not that the arrestee was engaged in criminal activity—the officer's belief that the arrestee was committing a crime need only be reasonable.

*Id.* (citing, *inter alia*, *Henry v. United States*, 361 U.S. 98, 102, 80 S. Ct. 168, 171 (1959)). Where, as here, the officers involved in

an investigation were in communication with one another, we may, in assessing probable cause, attribute to one officer the facts known to his fellow officers. *E.g.*, *United States v. Lyons*, 733 F.3d 777, 782 n.1 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 1779 (2014); *United States v. Sawyer*, 224 F.3d 675, 680 (7th Cir. 2000). This means that we may invest Kirby with knowledge of the facts known to her subordinate officers.

The general rule is that when the police have information from a reasonably credible witness that a person has committed a criminal act, they may rely on that witness's account, even when the suspect himself denies wrongdoing. *E.g.*, *Williamson*, 714 F.3d at 441. The police need not exhaust all available avenues of investigation, including those that might potentially exculpate the suspect. *Id.*

In this case, Kirby had reports from three credible witnesses indicating that Seiser had been drinking while driving his personal vehicle. Gail Glassford and Roseann Anderson both told Verta, and then they along with Gary Anderson told Price, that they had seen Seiser drinking from a large liquor bottle, and Gary Anderson additionally informed Price of the confrontation he had with Seiser while copying Seiser's license plate number, during which he detected the odor of alcohol on Seiser's breath. In addition, both Verta and Price had inspected Seiser's vehicle and had seen the bottle in the front seat of the car; to both it appeared to be an alcoholic beverage container. Both also saw that it contained a clear liquid inside; and Verta could see that the seal on the bottle had been broken. And when Verta had asked Seiser about the bottle, Seiser had been

evasive, first replying "What bottle?"and then twice refusing Verta's requests to inspect it.

We note in this regard that Illinois courts have repeatedly held that a police officer may reasonably infer from the discovery of a beer or liquor container—even an *empty* container—in or near an individual's car that the bottle had contained alcohol and had been open while the defendant was driving. *See People v. Miller*, 791 N.E.2d 1145, 1148 (Ill. App. Ct. 2003), *abrogated on other grounds by People v. Van Schoyck*, 904 N.E.2d 29, 32–33 (Ill. 2009); *People v. Gray*, 420 N.E.2d 856, 859 (Ill. App. Ct. 1981); *People v. Zeller*, 367 N.E.2d 488, 491 (Ill. App. Ct. 1977); *Stanford v. Glowacki*, No. 12 C 7502, 2013 WL 6447947, at *2 (N.D. Ill. Dec. 6, 2013); *Guidry v. Boyd*, No. 06 C 1600, 2007 WL 2317174, at *9 (N.D. Ill. Jul. 17, 2007); *see also Branch v. Gorman*, 742 F.3d 1069, 1073 (8th Cir. 2014) ("Courts routinely find probable cause under open container laws when police officers observe empty bottles in vehicles.") (collecting cases). It was no less reasonable in this case for the investigating officers (and Kirby) to infer that the clear liquid in the liquor bottle observed in Seiser's car was alcohol as opposed to water. And given the multiple witnesses who saw Seiser drinking from the bottle as he drove by them, it was equally reasonable to believe that he had been drinking alcohol while driving.

As Seiser points out, there were certain inconsistencies or inaccuracies in the witness accounts which would have been apparent to the officers at the time. The bottle wasn't labeled "vodka," as Gail Glassford had thought. Nor was it a gallon-sized container, as multiple witnesses, including Verta and

Price, had described it. (The bottle was roughly half that size.) But these are at worst minor discrepancies. There is no question that the bottle was, in fact, a liquor bottle, that it was labeled as such, and that it was relatively large. Verta and Price had both confirmed the presence of the bottle in Seiser's car.[2]

Nor did the negative results of the field sobriety tests that Kral and Madsen administered negate the possibility that Seiser had been drinking. Of course, at the point that those tests were administered, a substantial amount of time had passed since Seiser had been seen driving while drinking from the liquor bottle. Recall that Kathleen Glassford made her first call to the police reporting the incident at 2:18 p.m.; Madsen and Kral did not begin to process Seiser criminally until 4:45 p.m., nearly two and one-half hours later. So it would be fair to assume that if Seiser had been drinking alcohol, his degree of intoxication would have decreased and his ability to pass such tests would have increased during that time. As we noted in *Kraushaar v. Flanigan*, 45 F.3d 1040, 1052 (7th Cir. 1995), the passage of time coupled with the prospect of arrest will

---

[2] One of the inconsistencies that Seiser has highlighted concerns the speed at which he had reportedly been driving when Glassford and Roseann Anderson saw him drinking from the liquor bottle. Although it does appear in retrospect that they have made inconsistent statements as to whether Seiser was driving above or below the speed limit, the record does not indicate that they made inconsistent statements to the police officers who investigated the incident, or that the officers otherwise would have been aware of any such inconsistency. In any case, the speed at which Seiser was driving is a point collateral to whether or not he was drinking alcohol while driving.

naturally have a sobering effect on a person who has been drinking.

More to the point, the fact that an individual is able to complete one or more field sobriety tests successfully (the parties devote no attention in their briefs to the types and significance of the particular tests administered to Seiser) does not negate probable cause when other circumstances give rise to a reasonable belief that the individual is intoxicated. *See, e.g., State v. Bell*, 429 S.W.3d 524, 531–36 (Tenn. 2014) (so holding after surveying case law from other jurisdictions on this point). Each case necessarily must be assessed on its own facts, given that probable cause turns on the totality of the circumstances confronting the officer. *E.g., Gibbs v. Lomas*, No. 13-3121, — F.3d —, 2014 WL 2736066, at *5–*6 (7th Cir. June 17, 2014). Given the other circumstances we have highlighted, the fact that Seiser was able to pass the field sobriety tests administered to him did not foreclose probable cause to believe that he had been driving while intoxicated some two and one-half hours earlier (and thus to believe that a breathalyzer test would yield proof of his intoxication).

Similarly, the fact that none of the officers who had inter-acted with Seiser after the incident—including Verta, Kral, and Madsen—said they had noticed the scent of alcohol on Seiser's breath or observed overt signs of intoxication does not negate probable cause. The key facts that gave rise to the reasonable suspicion that Seiser had been driving while intoxicated were the witness sightings of him drinking from a liquor bottle while driving and the confirmation afterward by Verta and Price that there was an open liquor bottle in the front seat of Seiser's car. Morever, Gary Anderson, who reported having a confronta-

tion with Seiser after he copied down Seiser's license plate number, indicated that he *had* smelled alcohol on Seiser's breath. The police had no reason to disregard Gary Anderson's statement in this regard, even if the other officers did not themselves notice the scent of alcohol.

In sum, under the circumstances confronting Kirby, there was probable cause to administer the breathalyzer. Given the eyewitness accounts and the presence of a bottle labeled as containing an alcoholic beverage in Seiser's car, a reasonable person would have believed that Seiser had committed a DUI offense. It was therefore reasonable to believe that the breathalyzer would yield evidence of that crime.

B. Qualified immunity and administering the breathalyzer without a warrant

Because a breathalyzer examination is a form of search, a warrant for the test ordinarily is required, absent, for example, the presence of exigent circumstances that make obtaining a warrant impractical. *See Missouri v. McNeely*, 133 S. Ct. 1552, 1560–63 (2013); *Schmerber*, 384 U.S. at 770–71, 86 S. Ct. at 1835–36.

The Supreme Court's decision in *Schmerber* recognized that, in view of the natural metabolization of alcohol over time and the delays that can occur in obtaining a warrant, the need to timely ascertain an individual's blood-alcohol level may present an exigency that justifies a warrantless examination.

> The officer in the present case … might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under

the circumstances, threatened "the destruction of evidence," Preston v. United States, 376 U.S. 364, 367, 84 S. Ct. 881, 883. We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these special facts, we conclude that the attempt to secure evidence of blood-alcohol content in this case was an appropriate incident to petitioner's arrest.

*Ibid.*

In the wake of the *Schmerber* decision, the Illinois Appellate Court, like a number of other courts, appears to have concluded that the natural dissipation of alcohol from the bloodstream, coupled with the delay associated with seeking a warrant, constituted a per se exigency that routinely justified the warrantless administration of a breathalyzer. Thus, in *People v. Carey*, 898 N.E.2d 1127, 1134 (Ill. App. Ct. 2008), the court—without addressing how much time had passed before the defendant police officer was ordered to take a breathalyzer test or how much additional delay an attempt to obtain a warrant likely would have caused—said simply, "[A]lcohol in the bloodstream begins to naturally dissipate shortly after drinking stops and therefore the delay in obtaining a search warrant would have risked the loss of evidence." *Id.* (citing

*Schmerber*, 384 U.S. at 770–71, 86 S. Ct. at 1835–36).[3] The district court in this case employed the same reasoning in concluding that the breathalyzer was a reasonable search. R. 48 at 9. Courts from other jurisdictions, by contrast, had held that whether there were "special facts" (*see Schmerber*, 384 U.S. at 771, 86 S. Ct. at 1836) apart from the evanescent nature of blood-alcohol content establishing an exigency must be evaluated on a case-by-case basis. *See McNeely*, 133 S. Ct. at 1558 n.2 (collecting cases on both sides of this division of authority).

Subsequent to the district court's decision in this case, the Supreme Court in *McNeely* resolved the split against a rule of per se exigency in blood-alcohol cases. Relying in part on the fact that technological advances have made it possible to obtain warrants more expeditiously through such means as telephone, radio, email and other electronic communications, and videoconferencing, the Court reasoned that the dissipation of alcohol does not always present an exigency justifying the warrantless administration of a blood-alcohol test. 133 S. Ct. at 1560–61. Instead, the circumstances must be evaluated on a

---

[3]    *Carey* was decided by the First District appellate court, which has jurisdiction over Chicago. Courts in other districts had held similarly. *See People v. Ayres*, 591 N.E.2d 931, 933 (Ill. App. Ct. 3d Dist. 1992) ("We note that the evidence was evanescent in nature because alcohol in a DUI suspect's blood begins to dissipate shortly after the individual stops consuming alcohol. There is no time to seek out a magistrate to obtain a search warrant.") (citing *Schmerber*); *People v. Byrd*, 574 N.E.2d 1269, 1271 (Ill. App. Ct. 4th Dist. 1991) ("[T]he evidence is evanescent in nature. Alcohol in the bloodstream of a DUI suspect begins to dissipate shortly after drinking stops. There is no time to seek out a magistrate and secure a warrant.") (citing *Schmerber*).

case-by-case basis to determine whether warrantless action was justified. *Id.* at 1563.

Even if we assume, in view of the Court's decision in *McNeely*, that exigent circumstances did not excuse the failure to seek a warrant in this case, the doctrine of qualified immunity nonetheless shields Kirby from liability.[4] Qualified immunity bars a civil claim for damages against a government official when the official is performing a discretionary function and her conduct does not violate clearly established rights of which a reasonable person would have known. *E.g.*, *Sutterfield v. City of Milwaukee*, 751 F.3d 542, 572 (7th Cir. 2014) (citing, *inter alia*, *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)); *Volkman v. Ryker*, 736 F.3d 1084, 1089–90 (7th Cir. 2013). Put another way, an official making a discretionary decision is entitled to the protection of qualified immunity when a reasonable person in her position would not have appreciated that her conduct was illegal under the circumstances. *Id.* at 1090; *Phelan v. Vill. of Lyons*, 531 F.3d 484, 487 (7th Cir. 2008).

At the point that the breathalyzer test was administered to Seiser, a reasonable police official would have believed in light of *Carey* and like cases that so long as there was probable cause

---

[4]   The defendants raise a question as to why Kirby should be exposed to liability based on administration of the breathalyzer test, as she did not order that Seiser be subject to such a test; rather, that was the decision of officers Madsen and Kral. But giving Seiser the benefit of the doubt, we shall assume *arguendo* that Kirby's decree that Seiser be criminally processed included or triggered her subordinates' pursuit of ordinary, foreseeable tests for intoxication, including a breathalyzer test.

to justify a breathalyzer examination, there was no need to consider seeking a warrant first. By the time Seiser was being processed at the Ninth District, nearly two and one-half hours had transpired since he was seen drinking from the liquor bottle, and an attempt to obtain a warrant, through whatever means, would have portended at least some further delay. *Carey* suggested that dispensing with a warrant application was a sound course. And as the *McNeely* decision recognizes, there was a prior division of authority among courts on this very point. 133 S. Ct. at 1558 & n.2. Conflicting precedents present the very sort of uncertainty as to what the law requires that entitles a public official to qualified immunity. *See Reichle v. Howards*, 132 S. Ct. 2088, 2096 (2012) ("If judges … disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.") (quoting *Wilson v. Layne*, 526 U.S. 603, 618, 119 S. Ct. 1692, 1701 (1999)).

Seiser suggests that Kirby should not be given the benefit of qualified immunity because, in his view, Kirby usurped the role of a line police officer by ordering that Seiser be processed criminally—*i.e.*, that she inserted herself into an area not within the scope of her authority. *See Johnson v. Phillips*, 664 F.3d 232, 236–37 (8th Cir. 2011) (official who acts outside clearly established scope of his discretionary authority is not entitled to assert qualified immunity) (collecting cases). On the record before us, we reject the argument. Supervision of the IAD (among other divisions of the department) was one of Kirby's responsibilities as a deputy superintendent of the police force. Kirby testified that as an extension of her oversight responsibilities, it was within her purview to make decisions as to the

proper handling of a police officer who has been implicated in a crime. R. 44-1 Supp. Ex. C at 74–75. That testimony, not to mention ordinary logic, suggests that it was not beyond her authority to issue the order that Seiser be processed criminally. *See Anderson v. Creighton*, 483 U.S. 635, 643, 107 S. Ct. 3034, 3040–41 (1987) ("[W]e have been unwilling to complicate qualified immunity analysis by making the scope or extent of immunity turn on the precise nature of various officials' duties or the precise character of the particular rights alleged to have been violated."). Nor is it surprising that a high-ranking officer within the department would become involved in this instance, given the sensitivity of the allegations—that a Chicago police officer was drinking while driving, in a school zone, en route to his assigned post as a school safety officer—and the corresponding need to make sure the allegations were handled properly. The negative ramifications for the department in terms of the public trust would have been serious were it perceived that Seiser was given lenient treatment. In short, we are given no reason to believe, in light of Kirby's oversight authority, that it was beyond her purview to direct that Seiser be processed criminally. To the extent the decision to administer the breathalyzer is properly attributed to Kirby as a result of that order, we can see no reason why she should be deprived of qualified immunity.

C.  Malicious prosecution

Seiser has also alleged that the decision to charge him with the open-container violation (until the test of the bottle's contents proved negative for alcohol), constituted malicious

prosecution for which the City should be liable.[5] To prove the tort of malicious prosecution under Illinois law, Seiser bears the burden of proving that (1) the City initiated criminal proceedings against him; (2) those proceedings were terminated in his favor; (3) there was no probable cause to support the proceedings; (4) malice was present, *i.e.*, that the officer who initiated the proceedings was motivated by something other than a desire to bring a guilty party to justice; and (5) he suffered damages as result of the proceedings. *See*, *e.g.*, *Williams v. City of Chicago*, 733 F.3d 749, 759 (7th Cir. 2013); *Aleman v. Vill. of Hanover Park*, 662 F.3d 897, 907 (7th Cir. 2011) (malice); *Holland v. City of Chicago*, 643 F.3d 248, 254 (7th Cir. 2011). As the lack of probable cause is an element of malicious prosecution, evidence demonstrating that there was probable cause to believe the plaintiff had committed an offense is a complete bar to the claim. *E.g.*, *Venson v. Altamirano*, 749 F.3d 641, 651 (7th Cir. 2014).

After the breathalyzer examination yielded a negative result, Seiser was charged solely with the open-container violation. The governing Illinois statute provides in relevant part that "no driver may transport, carry, possess or have any alcoholic liquor within the passenger area of any motor vehicle upon a highway in [Illinois] except in the original container and with the seal unbroken." 625 ILCS 5/11-502(a). There is no dispute that the bottle that Seiser had with him in his car was "open" in the sense that its seal had been broken or that it was, in fact, a liquor bottle. Of course, what was in the bottle was

---

[5]   Seiser's opening brief makes clear that he is pursuing this claim against the City alone. Seiser Br. 23.

not alcohol, but that did not become clear until a month later, when the results of the laboratory testing were disclosed. So the essential question is whether, at the time was Seiser charged with the open-container violation, the facts known to the police (and, in particular, to Sergeants Verta and Cochran, who reportedly made the decision to issue the citation to Seiser) would have warranted a reasonable belief that the bottle contained alcohol.

The answer to that question is yes. Apart from the witnesses who had seen Seiser drinking from what appeared to be a liquor bottle, both Verta and Price observed the bottle on the front seat of Seiser's car. The bottle matched (on the whole) the description given by the witnesses with whom they had spoken, and it contained a clear liquid. When asked by Verta what was in the bottle, Seiser was evasive. A reasonable person confronted with these circumstances could reasonably believe that the open bottle contained alcohol.[6]

---

[6]    To the extent Seiser suggests that Illinois employs a more demanding standard for assessing probable cause vis-à-vis the decision to pursue a charge, we are not persuaded that is true. Notwithstanding recurrent references in Illinois malicious prosecution cases to a belief that the accused is "probably guilty of an offense," *e.g.*, *Howard v. Firmand*, 880 N.E.2d 1139, 1142 (Ill. App. Ct. 2007) (internal quotation marks and citations omitted), those same cases continue to affirm that "a state of facts that would lead a person of ordinary care and prudence to believe *or to entertain an honest and sound suspicion* that the accused committed the offense charged" is sufficient to establish probable cause to charge the accused, *id.* (emphasis supplied). Indeed, the Illinois Appellate court has twice rejected the notion that the probable cause standard for the decision to charge is meaningfully different from the probable cause standard for the decision to arrest. *See Johnson v.*

(continued...)

Seiser pursues a second line of argument. Given that he was ordered to turn over the bottle, he reasons, the City from the outset could not reasonably have expected that the bottle, and the laboratory results as to its contents, would be admissible against him at trial. In other words, whatever its suspicions, the City could not expect that it would be able to prove its case against him. His argument is based on *Garrity v. New Jersey*, 385 U.S. 493, 87 S. Ct. 616 (1967), which held that statements obtained from a police officer under threat of removal from office if he exercised his right to remain silent are not admissible against the officer in a subsequent criminal proceeding.

Contrary to the premise of Seiser's argument, it would not have been clear to the City or to Sergeants Verta and Cochran that the bottle necessarily was inadmissible against Seiser in a criminal proceeding. As the defendants point out, the Illinois appellate court in *Carey* expressly rejected an argument that the results of a breathalyzer test to which a police officer had been ordered to submit on pain of termination if he did not were inadmissible against the officer pursuant to *Garrity*. 898

---

[6] (...continued)
*Target Stores, Inc.*, 791 N.E.2d 1206, 1225 (Ill. App. Ct. 2003) (describing the two standards as "for all purposes, equal"; *Ross v. Mauro Chevrolet*, 861 N.E.2d 313, 320 (Ill. App. Ct. 2006); *see also London v. Harris*, No. 09 C 7797, 2013 WL 1405250, at *7 (N.D. Ill. Apr. 15, 2013) (pointing out decisions from both this court and the Illinois Appellate Court which have treated probable cause to arrest as dispositive of a malicious prosecution claim). What may, in practical terms, distinguish the decision to charge from the decision to arrest is any additional information that comes to light between the time a person is arrested and the point at which he is charged. *Johnson*, 791 N.E.2d at 1225; *Ross*, 861 N.E.2d at 320.

N.E.2d at 1139–40. The court reasoned that the Fifth Amend-
ment privilege against self-incrimination, on which *Garrity*'s
holding is based, applies only to testimonial and communica-
tive evidence, and not to physical evidence including the
results of a compulsory blood or breath test. *Id.* It thus would
have been reasonable for the charging officers to conclude that
*Garrity* posed no bar to the admission of the bottle, its contents,
and the results of the laboratory testing against Seiser in a
criminal proceeding.

Because there was probable cause to believe that Seiser had
violated the open-container statute, his malicious prosecution
claim is foreclosed.

### III.

The district court properly entered summary judgment in
favor of the defendants as to both the unreasonable search
claim as well the malicious prosecution claim, as both the
administration of the breathalyzer test and the decision to
charge Seiser with an open-container violation were supported
by probable cause.

AFFIRMED.